**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sarah Hager, et al., | No. CV-20-02275-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

In June 2019, Edward Michael Hager ("Hager") committed suicide one day after seeking mental health counseling at a clinic operated by the Department of Veterans Affairs ("VA"). In this action, Hager's spouse, Sarah Hager, who is acting on behalf of both herself and the statutory beneficiaries of Hager (collectively, "Plaintiffs"), has sued the United States ("Defendant") under the Federal Tort Claims Act ("FTCA"), alleging that the nurse who treated Hager at the VA clinic committed malpractice. Now pending before the Court are Defendant's motion to disqualify Plaintiffs' standard of care expert (Doc. 49) and Defendant's motion for summary judgment (Doc. 57). For the following reasons, the former is granted and the latter is denied without prejudice.

## BACKGROUND

I.    Relevant Factual Background

The following facts are derived from the parties' submissions and the record evidence and are uncontroverted unless otherwise noted.

Hager served in the United States Army from 2002 to 2006. (Doc. 57-1 at 18.) He

was deployed to Iraq for 15 months in 2003 and 2004, during which time he "[s]aw friends die, was shot at and sustained several blast injuries and brain concussion [sic]." (Doc. 63 at 13.)[1]

Hager's medical records reveal a series of mental health problems following his return to civilian life. In 2008, he was admitted for inpatient psychiatric care after his wife reported that he had written a suicide note. (Doc. 57-1 at 13.)[2] In 2008 or 2009, he began suffering from "paranoia." (*Id.*)[3]

On October 27, 2008, Hager underwent a neuropsychological screen. (Doc. 63 at 14.) The assessment report from the screen describes Hager's "verbal and visual memory abilities" as "compromised." (*Id.* at 15 ["Retention of both verbal and visual information following a brief delay was severely impaired . . . ."].) The report also notes that Hager reported a variety of psychiatric symptoms (*e.g.*, hypervigilance, frequent nightmares, and significant irritability) but that, "[i]nterestingly, when later asked to fill out self report measures of mood symptoms, his endorsement indicated only mild symptoms of depression and anxiety. . . . Inconsistency in . . . reports likely indicates that the inventories represent an underestimation of his current symptoms." (*Id.* at 16.)

On November 10, 2008, Hager saw a psychiatrist for symptoms related to post-traumatic stress disorder ("PTSD") and traumatic brain injury. (*Id.* at 12-13.) At that time,

---

[1]     Plaintiffs submitted a separate statement of facts in support of their opposition to Defendant's summary judgment motion. (Doc. 63.) This approach was improper under the scheduling order: "Local Rule of Civil Procedure 56.1 is suspended, except for subsection (d). The Court will decide summary judgment motions under Federal Rule of Civil Procedure 56 only. In other words, the parties may not file separate statements of facts or separate controverting statements of facts, and instead must include all facts in the motion, response, or reply itself. All evidence to support a motion or response that is not already part of the record must be attached to the briefs." (Doc. 13 at 5.) Based on the scheduling order, Defendant asks the Court to strike Doc. 63 under Rule 12(f). (Doc. 68 at 1-2.) The Court declines to do so—because Plaintiffs' exhibits were attached to the separate document, the Court will overlook the procedural misstep.

[2]     Hager described this incident to a medical provider in 2013 but stated he did not recall writing the note. (Doc. 57-1 at 13.)

[3]     The medical notes from the 2013 visit provide: "[Hager] states he's had paranoia since 08-09 when he was deployed . . . ." (Doc. 57-1 at 13.) This chronology appears to be inaccurate, as Hager was deployed during 2003 and 2004 and was discharged in 2006. It is therefore possible that the paranoia began before 2008. This distinction is not material to the analysis here.

- 2 -

1  Hager was experiencing "nightmares of combat," trouble sleeping, anxiety about crowds,

2  and "flashbacks when . . . driving." (*Id.* at 13.)

3      On June 17, 2013, Hager presented at a VA clinic in Phoenix and reported suffering

4  from "increasing paranoia" and sleep deprivation. (Doc. 57-1 at 13.) The paranoia

5  included suspicions that his wife was cheating on him, "thoughts that his boss [was] not

6  calling him," and "paranoia that the authorities are watching him because of a DVD of

7  possible pornography that didn't belong to him and he thinks was planted on him." (*Id.*)

8  Hager also thought "he was poisoned as he had blood in his urine and stool and chest pain."

9  (*Id.* at 18.)[4]  However, he denied past or present suicidal ideations. (*Id.* at 16-17.) The

10  provider determined that Hager was "[a]dequate for outpatient treatment." (*Id.* at 15. *See*

11  *also id.* at 22 [stating that Hager's screening assessment was "suggestive of moderately

12  severe depression"].) Hager was scheduled to see a psychiatrist within the following two

13  weeks. (*Id.* at 5 ¶ 12.) However, he did not keep the appointment. (*Id.*)

14      Six years later, on June 24, 2019, Hager presented as a walk-in patient at the VA's

15  Willow Clinic in Gilbert, Arizona and requested counseling services. (*Id.* at 4 ¶ 4, 6 ¶ 14.)

16  A medical support assistant took Hager's vital signs and "administered the Patient Health

17  Questionnaire (PHQ-2+I9), which is the standard depression and primary suicide risk

18  screen," and "the standard PTSD and primary suicide risk screen (PC-PTSD-5+I9)." (*Id.*

19  at 4 ¶ 7, 6 ¶¶ 16-17.) Hager scored "negative for risk of suicide over the previous two

20  weeks" on both screens. (*Id.* at 6 ¶¶ 16-17.)

21      Next, Hager was seen by the triage nurse. (*Id.* at 4 ¶¶ 4-5.) At that time, William

22  Weishaar ("Nurse Weishaar") worked as the regular triage nurse at Willow Clinic. (Doc.

23  63 at 25.) When Nurse Weishaar wasn't working, "[t]he other nurses in the Willow Clinic

24  rotated to cover [the] triage position." (Doc. 57-1 at 4 ¶ 5.) On June 24, 2019, Vicky

25  Markey ("Nurse Markey") was covering triage. (*Id.*) At all relevant times, Nurse Markey

26

27  ───────────────

[4]      The day before, on June 16, 2013, Hager presented at an emergency room with chest
pain. (Doc. 57-1 at 18; Doc. 63 at 11.) The notes from that visit indicate a friend reported
28  that Hager's wife was due to deliver their first baby on June 15, 2013, and that Hager
believed the baby's sex had been changed inside the womb. (Doc. 63 at 11.)

worked as a mental health nurse at Willow Clinic.  (*Id.* at 3 ¶ 3.)

During the June 24, 2019 consultation with Nurse Markey, Hager requested counseling, explaining: "I am feeling anxious and need some counseling.  My wife and kids are gone for two weeks and I don't know what to do with myself."  (*Id.* at 26.)  He also reported that he had "hardly slept in days" and "hate[d] being alone and in [his] own head."  (*Id.* at 26.)  Hager also mentioned that he had recently stopped running a website for veterans because it was getting too "dark" and "bringing up past memories" and that, as a result, he had "too much time on his hands and [was] thinking too much . . . ."  (*Id.*)

Nurse Markey "administered the Columbia Suicide Severity Rating Scale (C-SSRS), a standard suicide screening tool widely used in the mental health and primary care settings, and completed a suicide risk assessment (SRA), which is a clinical evaluation to determine the nature and degree of suicide risk/probability."  (*Id.* at 6-7 ¶ 20.)  "The C-SSRS and SRA indicated that Mr. Hager was at low risk for suicide."  (*Id.* at 7 ¶ 20.)  In relevant part, Hager reported that in the past month, "he had never wished that he was dead or that he could go to sleep and not wake up," did not have "any actual thoughts of killing himself," and had not considered suicide, and that in his lifetime, he had never prepared or attempted to commit suicide.  (*Id.* at 7 ¶¶ 21-23.)  Nurse Markey then asked Hager "whether he had firearms in his home" and, if so, whether "he would consider removing his firearms from his residence."  (*Id.* at 7 ¶¶ 24-25.)  Hager "agreed to take [his firearms] to his father's house, stating 'I am not suicidal or anything but it can only be a smart move to get them out of my house.'"  (*Id.* at 7 ¶ 25.)  Hager also represented that "he intended to stay with his father while his family was out of town."  (*Id.*)

Nurse Markey "scheduled Mr. Hager for an appointment with . . . a psychiatrist at the Willow Clinic on July 24, 2019."  (*Id.* at 9 ¶ 40.)  She also provided him with information about other VA resources, including the Mesa Vet Center, "a small, non-medical counseling center staffed by counselors [that] offers on[e]-on-one counseling and group sessions."  (*Id.* at 10 ¶¶ 43, 45-47.  *See also id.* at 10 ¶ 45 ["I also gave Mr. Hager information about the emergency services available through the VA and instructed him to

1   call 911 or the Veterans Crisis Line if he was having thoughts of suicide or homicide or

2   was otherwise in mental distress."].)

3       After the consultation with Nurse Markey, Hager called his father and asked if his

4   parents "would stop by after work to pick up his weapons." (*Id.* at 40.) Around 5:00 PM,

5   Hager's parents went to his house. (*Id.*) During the visit, Hager told his mother that the

6   VA had "suggested that a family member take his weapons." (*Id.* at 41.) His father

7   retrieved the guns, which were "all packed up" in a bag, from the master bedroom. (*Id.* at

8   41-43.) After about an hour and a half, his parents left. (*Id.* at 42.)

9       The following day, Hager was found dead in his home from a self-inflicted gunshot

10  wound. (*Id.* at 50.)

11  II.   Procedural History

12      On November 24, 2020, Plaintiffs initiated this action. (Doc. 1.)

13      On April 22, 2021, the Court set discovery deadlines, including: (1) October 22,

14  2021 for Plaintiffs' expert disclosures; (2) January 21, 2022 for rebuttal expert disclosures;

15  and (3) March 11, 2022 for expert depositions. (Doc. 13 at 3.) Some of these deadlines

16  were later extended at the parties' joint request. (Docs. 29, 38.)

17      On July 1, 2022, after the expiration of the deadlines for the completion of expert

18  and fact discovery and Rule 26(a)(3) pretrial disclosures (*see* Doc. 45), Defendant moved

19  to disqualify Plaintiffs' standard of care expert. (Doc. 49.) On July 29, 2022, Defendant

20  moved for summary judgment. (Doc. 57.) Both motions are now fully briefed. (Docs. 58,

21  60, 62, 63, 66, 68.)

22      On January 27, 2023, the Court issued a tentative ruling. (Doc. 70.)

23      On February 13, 2023, the Court heard oral argument. (Doc. 71.)

24                              **DISCUSSION**

25      "The Federal Tort Claims Act (FTCA) allows a plaintiff to bring certain state-law

26  tort suits against the Federal Government." *Brownback v. King*, 141 S. Ct. 740, 745 (2021).

27  *See also* 28 U.S.C. §§ 1346(b)(1), 2674. Here, Plaintiffs assert three FTCA claims based

28  on Arizona's law of medical malpractice: medical negligence, wrongful death, and

1    vicarious liability.  (Doc. 1 ¶¶ 1, 50-69.)[5]

2    I.      Disqualification Of Plaintiffs' Expert

3            Plaintiffs disclosed Boulay Bala, a registered nurse ("Nurse Bala"), as their expert

4    witness on the standard of care.  (Doc. 58-6.)  Defendant moves to disqualify Nurse Bala

5    and, based in part on that disqualification, moves for summary judgment.  The issues

6    addressed in the two motions substantially overlap and both sides raise disqualification

7    arguments in their summary judgment submissions that were not raised (or, at least, not

8    raised in such clear terms) in relation to the motion to disqualify.  For clarity and efficiency,

9    the Court has attempted to integrate the disqualification arguments from all of the parties'

10   submissions into one, cohesive analysis.

11           A.      **Legal Standard**

12           Rule 601 of the Federal Rules of Evidence provides that "[e]very person is

13   competent to be a witness unless these rules provide otherwise.  But in a civil case, state

14   law governs the witness's competency regarding a claim or defense for which state law

15   supplies the rule of decision."  *Id.*  *See also Higgenbottom v. Noreen*, 586 F.2d 719, 722

16   (9th Cir. 1978) ("The competence of witnesses is for the court to decide in accordance with

17   state law if state law 'supplies the rule of decision.'").  FTCA claims are "governed by the

18   substantive law of the place where the act or omission complained of occurred."  *Yako v.*

19   *United States*, 891 F.2d 738, 745 (9th Cir. 1989).  *See also* 28 U.S.C. § 1346(b)(1).

20   Accordingly, Arizona law governs whether Nurse Bala is qualified to render

21   standard-of-care opinions here.

22           Under Arizona law, "[e]xperts testifying to the standards of care of medical

23   professionals must satisfy . . . the 'heightened' requirements of A.R.S. § 12-2604."

24   *Windhurst v. Ariz. Dep't of Corr.*, 501 P.3d 752, 755-56 (Ariz. Ct. App. 2021*), review*

25   *granted* (2022).  *See also Seisinger v. Siebel*, 203 P.3d 483, 493 (Ariz. 2009) (noting that

26

27   ---
     [5]      Section 12-561(2) of the Arizona Revised Statutes defines "Medical malpractice
28   action" as "an action for injury or death against a licensed health care provider based upon
     such provider's alleged negligence, misconduct, [or] errors or omissions in the rendering
     of health care, medical services, nursing services or other health-related services . . . ."

"§ 12-2604(A) provides that certain expert testimony cannot be received" and "is substantive insofar as it requires a certain type of evidence to prove an element of the tort"); *Wright v. United States*, 2008 WL 820557, *4 (D. Ariz. 2008) (for FTCA medical malpractice claims where substantive Arizona law applies, Federal Rule of Evidence 601 "requires witness competency to be determined by Arizona law, including A.R.S. § 12-2604").

### B.    The Parties' Arguments

Defendant moves to disqualify Nurse Bala, "[t]he expert witness disclosed by Plaintiffs to opine that Nurse Markey fell below the standard of care in her treatment of Mr. Hager." (Doc. 49 at 2.)[6] Defendant asserts that Nurse Markey is a "licensed registered nurse and is board-certified in psychiatric-mental health nursing (PMH-BC) by" the American Nurses Credentialing Center ("ANCC") and the "care at issue is specialty . . . mental health care." (*Id.* at 5.)  Defendant notes that Nurse Bala is not, in contrast, board certified in that specialty.  (*Id.*)  Thus, Defendant argues that under A.R.S. § 12-2604, Nurse Bala is not qualified to provide expert testimony establishing the standard of care applicable to Nurse Markey.  (*Id.* at 2-5.)[7]

In response, Plaintiffs argue that Defendant "failed to provide evidence that Nurse Markey is actually certified as she so claims." (Doc. 58 at 1-2.)  In a related vein, Plaintiffs argue that Nurse Markey received her certification from a credentialling center, not a medical board, and is thus not board certified for purposes of A.R.S. § 12-2604(A)(1).  (*Id.* at 2.)  Plaintiffs elaborate that Nurse Markey merely "took a test provided by a clearinghouse certification center and had enough years in mental health care to be able to purchase a certificate for her wall that may entitle her to a pay raise in certain organizations." (Doc. 62 at 4-5.)  Next, Plaintiffs argue that their lawsuit alleges that Nurse

---

[6]     In a footnote, Defendant also challenges the sufficiency of a report by Dr. Thomas Joiner, Jr., Plaintiffs' rebuttal expert, but does not request any relief from the Court in relation to that challenge.  (Doc. 49 at 2 n.1.)

[7]     In its motion for summary judgment, Defendant "incorporates the arguments made in its Motion to Disqualify Plaintiffs' Standard of Care Expert" and "re-urges the Court to disqualify Nurse Bala." (Doc. 57 at 6.)

1    Markey's "work at the triage desk . . . was below the standard of care of a triage nurse,"
2    not of a mental health nurse, and thus "[h]er certification in clinical practice is not at issue."
3    (Doc. 58 at 2.)  Next, Plaintiffs argue that if Nurse Bala is disqualified, Nurse Weishaar,
4    the regular triage nurse, has provided testimony that establishes Nurse Markey fell below
5    the standard of care.  (*Id.*)  Finally, and in the alternative, "Plaintiffs request that this Court
6    permit them to substitute Nurse Rebecca Puchkors as their standard of care expert."  (*Id.*)

7         In reply, Defendant contends the record evidence establishes that Nurse Markey is
8    "board certified as a Psychiatric Mental Health Nurse."  (Doc. 60 at 1-2.)  Defendant notes
9    that the ANCC is "accredited by the Accreditation Board for Specialty Nursing
10   Certification (ABSNC)," which is "the only accrediting body specifically for nursing
11   certification."  (*Id.* at 2.)  After summarizing the requirements an applicant seeking to
12   become a PMH-BC must fulfill, Defendant argues that "[o]btaining a certification from a
13   program accredited by ABSNC is a registered nurse's equivalent to a physician's
14   certification from a medical specialty board."  (*Id.* at 2-3.)  As for whether Nurse Markey
15   was working within her specialty when she treated Hager, Defendant explains that although
16   Nurse Markey was "covering for the mental health clinic's triage nurse" on the day in
17   question, the only difference between the care provided by the triage nurse and that
18   provided by Nurse Markey as a psychiatric mental health nurse is that the triage nurse sees
19   "walk-in mental health patients instead of patients with previously scheduled
20   appointments."  (*Id.* at 3.)  Finally, Defendant argues that Nurse Weishaar cannot testify as
21   to Nurse Markey's standard of care because, like Nurse Bala, he is "not board certified in
22   psychiatric and mental health nursing."  (*Id.* at 4.)  At any rate, Defendants contend that
23   Nurse Weishaar's testimony "does not establish the standard of care."  (*Id.*)

24        C.    **Analysis**

25        Section 12-2604(A) of the Arizona Revised Statutes requires a person giving expert
26   testimony on the appropriate standard of practice or care in an action alleging medical
27   malpractice to be "licensed as a health professional in this state or another state."  The
28   statute provides that such an expert also must meet the following criteria:

> If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty or claimed specialty as the party against whom or on whose behalf the testimony is offered. If the party against whom or on whose behalf the testimony is offered is or claims to be a specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty.

*Id.* § 12-2604(A)(1). Based on this language, the Arizona Supreme Court has provided the following framework for applying § 12-2604: "The court must initially determine if the care or treatment at issue involves the identified specialty, which may include recognized subspecialties. If it does, testifying experts must share the same specialty as the treating physician. The trial court then must determine if the treating physician is board certified within that specialty. If so, any testifying expert must also be board certified in that specialty." *Baker v. Univ. Physicians Healthcare*, 296 P.3d 42, 49 (Ariz. 2013). *See also id.* at 46 ("[T]he statute does not define the terms 'specialist' or 'board certified,' and Arizona law does not otherwise provide general definitions for these terms.").

Here, the parties dispute (1) whether the treatment at issue involved an "identified specialty" (*i.e.*, psychiatric mental health nursing); and (2) whether Nurse Markey was "board certified within that specialty."

### 1. Identified Specialty

Defendant contends that "[w]hen Nurse Markey treated Mr. Hager she was rendering care within the scope of her board certification" as a psychiatric mental health nurse. (Doc. 49 at 5. *See also id.* ["The care at issue is specialty care – that is, mental health care."].) To support its position, Defendant references paragraphs 43 through 49 of the complaint, which allege, in relevant part:

> [Hager] went to the VA on June 24, 2019, and reported the following: A. He was anxious and in need of counseling; B. His wife and kids were gone and he "didn't know what to do with himself;" C. His thoughts were "getting too dark [and] bringing up past memories;" and D. He had "too much time on his hands," and he was "thinking too much." . . . He also reported having firearms at his house. . . . Instead of providing any services to [Mr. Hager], the VA provider told [Hager] to give his guns to a family member and come back in thirty days for a counselling session. . . . As a direct and proximate result of the Phoenix VA healthcare providers breaching the applicable standard of care, [Hager] committed suicide . . . .

- 9 -

1  (Doc. 1 ¶¶ 43-47.)

2      Plaintiffs argue that, although Nurse Markey was certified in the "practice of clinical

3  mental health care," the complaint challenges "her work at the triage desk[,] which is not

4  clinical mental health care." (Doc. 58 at 2. *See also id.* at 8 ["At the time she refused to

5  provide [Hager] with a counsellor to talk to – as [he] requested – Nurse Markey was simply

6  filling in for the normal triage nurse."].) Plaintiffs contend that "[e]valuating someone in

7  triage is not the same as providing clinical care" and note that the regular triage nurse "does

8  not have a certification in clinical care." (*Id.* at 7-8.)

9      In reply, Defendant asserts that the triage nurse is "assigned solely to the mental

10  health clinic" and sees "walk-in mental health patients." (Doc. 60 at 3.) According to

11  Defendant, "the care provided was the same whether the patient was a walk-in patient [seen

12  by the triage nurse] or an established patient [seen by a psychiatric nurse]." (*Id.*) Thus,

13  Defendant argues that the mere fact Nurse Markey provided psychiatric mental health care

14  to Hager as a walk-in patient (rather than as a patient with a scheduled mental health

15  appointment) has no bearing on whether Nurse Markey was "practicing within her

16  specialty as a psychiatric mental health nurse." (*Id.* at 3-4.)

17      "[A]n expert must establish the same specialization as the health care provider under

18  § 12-2604(A) when the care or treatment at issue was within that specialty." *Rasor v. Nw.*

19  *Hosp., LLC*, 403 P.3d 572, 577 (Ariz. 2017) (internal quotation marks omitted). For

20  purposes of § 12-2604, "specialty" means "a limited area of medicine in which a physician

21  is or may become board certified." *Baker*, 296 P.3d at 48. Whether the care or treatment

22  at issue involves a certain specialty or subspecialty "will depend on the circumstances of a

23  particular case." *Id.* at 49.

24      The Court agrees with Defendant that Nurse Markey was acting within her specialty

25  as a psychiatric mental health nurse when she treated Hager. Nurse Markey encountered

26  Hager as a walk-in patient at a VA mental health clinic. (Doc. 57-1 ¶ 3 [Markey

27  declaration, describing the Willow Clinic as a VA "outpatient mental health care clinic"].)

28  After Hager requested counseling, Nurse Markey evaluated Hager's suicide risk level and

psychiatric treatment needs using several assessment tools, discussed various mental health safety strategies, and scheduled Hager for a counseling appointment.  (Doc. 57-1 at 3-11 [Markey declaration].)  Defendant asserts this care is effectively identical to what Hager would have received had he been treated by Nurse Markey in her normal capacity as a psychiatric nurse (Doc. 60 at 3) and the record evidence supports this assertion.  (Doc. 49-1 at 3 [Markey resume, explaining Markey's duties as a psychiatric nurse]; Doc. 57-1 at 2 ¶¶ 6-9 [Markey declaration, explaining the process for assessing walk-in patients]; Doc. 60-1 at 12-16 [Weishaar deposition, same]).  Plaintiffs' attempt to distinguish between "triage" and "clinical care" is unconvincing—Plaintiffs provide no evidence that triage and clinical care are different "specialties" within the meaning of § 12-2604, at least with respect to the Willow Clinic.  *See also Harrelson v. Dupnik*, 2014 WL 2510530, *9 (D. Ariz. 2014), *report and recommendation adopted as modified*, 2014 WL 2510569 (D. Ariz. 2014) ("[W]hether or not there is a specialty involved in being a provider or medical director . . . is not the relevant inquiry.  What is relevant is whether the care or treatment at issue involves an identified specialty.").

The fact that Nurse Weishaar (the regular triage nurse) was not certified in psychiatric mental healthcare is of no consequence.  Section 12-2604 "requires a testifying expert to be certified in the board-certified treating physician's specialty, even if physicians in other specialties might also have competently provided the treatment and even though different specialists may be prepared by training and experience to treat the same medical issue for a particular patient."  *Genovese v. Bodynew Inc*, 2018 WL 2355188, *3 (Ariz. Ct. App. 2018) (internal quotation marks omitted).  *See also Preszler v. Corwin D. Martin PC*, 2022 WL 175568, *3 (Ariz. Ct. App. 2022), *review denied* (2022) ("Even though [Plaintiff] asserts that a periodontist and oral and maxillofacial surgeon could have treated [Plaintiff], Martin was practicing within his board-certified specialty of oral and maxillofacial surgery at the time he rendered treatment to [Plaintiff]. . . .  Accordingly, Section 12-2604 required [Plaintiff's expert] to be certified in that same specialty . . . .").

…

2.   <u>Board Certification</u>

Because Nurse Markey was acting within her specialty as a psychiatric mental health nurse when she saw Hager, the requirements of A.R.S. § 12-2604(A)(1) apply. *Baker*, 296 P.3d at 47.   Section 12-2604(A)(1) provides, in relevant part: "If the party against whom . . . the testimony is offered is or claims to be a specialist who is board certified, the expert witness shall be a specialist who is board certified in that specialty or claimed specialty."

Here, Nurse Markey's resume describes her as a "RN-BC (board certified in psychiatric and mental health nursing)."  (Doc. 49-1 at 3.)  On October 12, 2021, during her deposition, Nurse Markey testified that she is "certified in psychiatric and mental health through the American Nursing (sic) Credentialing Center."  (*Id.* at 12-13.  *See also id.* at 13 [describing the certification process].)  In July 2022, Plaintiffs' counsel obtained a letter from the ANCC verifying that, at all relevant times, Nurse Markey was certified as a Psychiatric Mental Health Nurse–Board Certified ("PMH-BC") by the ANCC.  (Doc. 58-12 ¶¶ 6, 9.)

In contrast, Nurse Bala is licensed as a Registered Nurse and a Public Health Nurse. (Doc. 49-1 at 26; Doc. 63 at 33.)  As of October 22, 2021, Nurse Bala worked as an "RN Administrative Supervisor in the Acute Psychiatric Behavioral Health Center at John Muir Health in Concord, California."  (Doc. 63 at 33.)  "In the year preceding the events in question, [Nurse Bala] was in full-time active clinical practice as a staff Registered Nurse/Lead Nurse in the Acute Psychiatric/Mental Health Unit of St. Helena Hospital in St. Helena, California . . . ."  (*Id.*)  Nurse Bala's resume does not indicate any certification in psychiatric or mental health nursing (Doc. 49-1 at 26) and in a deposition on May 17, 2022, Nurse Bala stated that she is not "board certified in any particular practice area" (*id.* at 21).

The parties agree that Nurse Bala is not board certified in psychiatric mental health nursing.  Thus, Plaintiffs' arguments focus on whether Nurse Markey is board certified such that § 12-2604 would require Nurse Bala to have the same certification.  First,

1    Plaintiffs contend there is no "evidence that Nurse Markey is actually certified as she so

2    claims." (Doc. 58 at 1.) This contention is belied by the record. Nurse Markey testified

3    that she is "certified in psychiatric and mental health" through the ANCC (Doc. 49-1 at

4    12-13) and provided an affidavit describing herself as "a licensed registered nurse

5    board-certified in psychiatric and mental health nursing by the American Nurses

6    Credentialing Center" (Doc. 57-1 at 3 ¶ 2). Moreover, a paralegal for Plaintiffs' counsel

7    states, in an affidavit, that Plaintiffs' counsel received a "verification letter" from the

8    ANCC in July 2022 stating that Nurse Markey has a "PMH-BC" certification. (Doc. 58-

9    12 ¶ 9.) Accordingly, the record establishes Nurse Markey's certification.

10          Plaintiffs next contend that Nurse Markey is not *board* certified because she merely

11   "paid for a certificate after taking a short test through a credentialling center." (Doc. 58 at

12   2. *See also id.* at 7 ["Because the ANCC is not a medical board, Markey cannot be

13   considered 'board certified.'"].) Plaintiffs contrast Nurse Markey's ANCC certification

14   with specialty certifications for physicians from the American Board of Medical Specialties

15   ("AMBS"), arguing that Nurse Markey did not fulfill the AMBS requirements for board

16   certification and that her "certificate in the 'clinical knowledge and skills of registered

17   nurses in the psychiatric-mental health specialty after initial RN licensure'" is not

18   comparable. (*Id.* at 6-7.) In reply, Defendant argues that the ANCC "is accredited by the

19   Accreditation Board for Specialty Nursing Certification (ABSNC), . . . the only accrediting

20   body specifically for nursing certification." (Doc. 60 at 2, quotation marks omitted.)

21   Defendant further notes that to become certified through the ANCC as a PMH-BC, an

22   applicant must hold a current, active license as a registered nurse, have "practiced for the

23   equivalent of two years as a full-time registered nurse," have at least 2,000 hours of

24   "clinical practice in psychiatric-mental health nursing" within the past three years, and

25   complete 30 hours of continuing education in the specialty. (*Id.*)

26          The Court concludes that Nurse Markey's PMH-BC credential from the ANCC is a

27   "board certification" for purposes of § 12-2604. Plaintiffs make much of the fact that the

28   ANCC "is not—as its name states—a medical board." (Doc. 58 at 7. *See also id.*

- 13 -

[distinguishing between a "credentialling center" and a "medical board".)  But even if the ANCC is not a literal board,[8] a nurse certified by the ANCC may be considered "board certified" within the meaning of § 12-2604.  As noted by Defendant, the ANCC is accredited by the ABSNC, which is an accreditation board.  (Doc. 60 at 2.)  Screenshots of the ANCC's website, attached to Plaintiff's response, refer to "ANCC *board* certification." (Doc. 58-13 at 4, emphasis added.)  The attached webpage explaining how to obtain a PMH-BC describes the certification as "ANCC Psychiatric-Mental Health Nursing board certification."  (*Id.* at 8.)  Notably, it also indicates that the "BC" in "PMH-BC" stands for "Board Certified."  (*Id.*)  This evidence is sufficient to establish that Nurse Markey's certification in PMH-BC from the ANCC was a board certification for purposes of § 12-2604(A)(1).

The fact that ANCC certification "is not the same as a physician's specialty board-certification, which typically requires the completion of both medical school and a residency program" (Doc. 58-14), does not mean that ANCC certification isn't board certification for purposes of § 12-2604.  By its plain terms, § 12-2604(A) applies to a "person licensed as a health professional."  Arizona courts have repeatedly applied the statute to nurses and other non-physician healthcare professionals, none of whom had a "physician's specialty board certification."  *See, e.g.*, *Trujillo v. United States*, 2018 WL 1729345, *3 (D. Ariz. 2018), *aff'd*, 786 F. App'x 124 (9th Cir. 2019) (applying § 12-2604(A)(1) to a physician's assistant); *Atencio v. Arpaio*, 2015 WL 11117187, *6 (D. Ariz. 2015) (applying § 12-2604(A)(1) to a licensed clinical social worker and a licensed professional counselor); *Cornerstone Hosp. of Se. Ariz., L.L.C. v. Marner*, 290 P.3d 460, 472 (Ariz. Ct. App. 2012) (holding that nursing qualifies as a "health profession" for purposes of § 12-2604(A)(2)).  As the statute's language makes clear, § 12-2604 does not require the board certification to be a *physician* board certification.  To the extent the *Baker* court defined "specialty" in terms of board certification for physicians, this

---

[8]    The Court notes that the only evidence Plaintiffs provide to establish that the ANCC is not a "board" is the fact that the word "board" is not in its name.  (Doc. 58 at 7.)

- 14 -

definition is inapplicable where, as here, the relevant standard for care is that of a psychiatric mental health nurse. Thus, Plaintiffs' assertion that a physician's board certification and an ANCC certification are distinct (because the former requires certain "years of training") is unavailing.[9] *See also St. George v. Plimpton*, 384 P.3d 1243, 1247-48 (Ariz. Ct. App. 2016) ("[B]ecause Nurse Franklin is certified by the ASBN as a certified nurse midwife, any standard of care expert testifying against her must likewise be a certified nurse midwife.").[10]

To summarize, Nurse Markey was, at all relevant times, a registered nurse who was board certified in "psychiatric mental health nursing" by the ANCC. Nurse Bala does not have the equivalent certification. Thus, because Nurse Markey was working within this specialty when she treated Hager, Nurse Bala is not qualified to provide expert testimony on the appropriate standard of care applicable to Nurse Markey. Accordingly, the Court grants Defendant's request to exclude Nurse Bala as Plaintiffs' standard of care expert.

### 3.   Substitution

In response to both of the pending motions, Plaintiffs "request that this Court permit them to substitute Nurse Rebecca Puchkors as their standard of care expert." (Doc. 58 at 2; Doc. 62 at 4-5.) Nurse Puchkors is a registered nurse with a PMH-BC certification from the ANCC. (Doc. 58-2 at 1.)

Defendant contends that "Plaintiffs should not be given additional time to secure a qualified standard of care expert" because they "did not seek additional time to secure a standard of care expert who was board certified in psychiatric-mental health nursing before producing their expert reports although they knew at that time that Nurse Markey was board certified." (Doc. 49 at 6.)

---

[9]     Plaintiffs also provide no evidence to support this assertion. (*See generally* Docs. 58-1 through 58-14.)

[10]     Under Arizona regulations, a certified nurse midwife may be certified "by a nursing certification organization accredited by the Accreditation Board for Specialty Nursing Certification, the National Commission for Certifying Agencies, or an equivalent accrediting agency as determined by the Board." Ariz. Admin. Code § R4-19-310. *See also* A.R.S. § 32-1601(5) (defining "certified nurse midwife"). The ANCC is also accredited by the ABSNC. (Doc. 60 at 2.)

1

2

3

4

5

6

7

8

Plaintiffs respond that substitution is warranted because they "spent half a year trying to get [Nurse] Markey's credentials," Nurse Markey "never testified that she had a board certification," and "the first mention of a purported 'board' came a day before the Plaintiffs' expert disclosure." (Doc. 58 at 9.) Plaintiffs also note that "witness qualifications were the basis for motion-work at the beginning of this year" and argue that "Defendant needlessly delayed in filing this pending motion." (*Id.*)[11] Based on these facts, Plaintiffs contend that the factors considered by the Arizona Supreme Court in *Rasor* weigh in favor of allowing substitution. (*Id.*)[12]

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

In reply, Defendant contends that Plaintiffs' "first proper request" for Nurse Markey's credentials occurred on September 17, 2021 and it timely responded to that request on October 20, 2021 with Nurse Markey's resume, which describes her as "board certified in psychiatric and mental health nursing." (Doc. 60 at 5.)[13] Additionally, Defendant notes that Plaintiffs' counsel "did not ask . . . whether [Nurse Markey] had any certifications or specializations" when he deposed Nurse Markey on October 12, 2021—instead, "that testimony was elicited by defense counsel." (*Id.*) Accordingly, Defendant contends that "Plaintiffs were aware that Nurse Markey was certified in psychiatric and mental health nursing by the ANCC" before October 22, 2021, the deadline for Plaintiffs to disclose expert witnesses, yet "Plaintiffs did not seek additional time to secure a similarly qualified expert, despite moving for additional time to secure a rebuttal expert with defense counsel's consent." (*Id.* at 6.) As for the timing of the disqualification motion, Defendant contends it "was not aware that Nurse Bala was not board certified in psychiatric and mental health nursing . . . until she was deposed on May 17, 2022" and then "moved to disqualify her on July 1, 2022, the date set in the Case Management Order for motions

24

25

[11] Plaintiffs' contention that Defendant "is not seeking any sort of case-dispositive relief" (Doc. 58 at 9) is inaccurate in light of Defendant's motion for summary judgment (Doc. 57).

26

27

[12] In their response to Defendant's motion for summary judgment, Plaintiffs suggest that "[i]t may even be an abuse of discretion not to allow the substitution." (Doc. 62 at 4 n.1.)

28

[13] Defendant reiterates this point in its reply in support of summary judgment. (Doc. 68 at 3.)

challenging expert testimony." (*Id.*) Finally, Defendant contends that if substitution is allowed, it should "be given an opportunity to depose the new expert . . . [and] have its expert address the new expert's opinions." (Doc. 68 at 3 n.1.)

"Although ordinarily 'a plaintiff's failure to provide a qualified standard-of-care expert would justify summary judgment for the defense,' the Court may deny summary judgment and allow the plaintiff to nominate a new expert where the plaintiff properly seeks relief under Rule 56(d)." *Ellsworth v. United States*, 2018 WL 1784687, *4 (D. Ariz. 2018) (citation omitted).[14] "In determining whether to grant such relief, the Court considers 'both the good faith or lack thereof of the plaintiff in proposing the initial expert whose qualifications are questioned on summary judgment, as well as the defendant's waiting to challenge the proposed expert until this later stage of litigation . . . if the qualifications were plainly inadequate in the affidavit.'" *Id.* (quoting *Rasor*, 403 P.3d at 577).

Here, the following facts provide context for Plaintiffs' substitution request. On May 10, 2021, Plaintiffs' counsel emailed defense counsel, stating, in relevant part: "I am very interested in knowing the particulars of the board certification in Nurse Markey's title. We have assumed it is a mental health specialization, but I can't find anything online. Can you ask right away so can address that with my experts?" (Doc. 58-5 at 1-2.) On June 10, 2021, Plaintiffs' counsel sent Nurse Bala's "expert witness affidavit" to defense counsel. (Doc. 58-6 at 1.) The affidavit described Nurse Bala as "Registered Nurse and a Public Health Nurse," "educated in acute psychiatric care and intervention." (*Id.* at 2 ¶ 1.) The affidavit also indicated that Nurse Bala's resume was attached. (*Id.*) Nurse Bala's resume, in turn, provides Nurse Bala's "licenses and certifications." (Doc. 49-1 at 26.) The list does not include any certification in psychiatric mental health nursing. (*Id.*)

On August 3, 2021, Plaintiffs' counsel sent another email to defense counsel,

---

[14] Plaintiffs formally filed a separate Rule 56(d) motion requesting this relief. (Doc. 59). The Court denied the Rule 56(d) motion as moot because the request to substitute Nurse Puchkors for Nurse Bala was "already properly before the Court via Plaintiffs' other filings." (Doc. 67 at 2.)

stating: "I asked a question about Nurse Markey's qualifications.  Can you get a cv for her?"  (Doc. 58-5 at 1.)

On September 14, 2021, Plaintiffs' counsel again emailed defense counsel, stating: "We have been trying for several months to get the deposition of Nurse Markey for some time.  I have a very open calendar (along with my partner).  We have received zero response to my email requests.  Our expert disclosure is due on October 22[, 2021].  I need to depose Nurse Markey several weeks before that deadline, so our expert can review the deposition."  (Doc. 58-7 at 1.)

On September 17, 2021, Plaintiffs served their First Set of Requests for Production of Documents on Defendant.  (Doc. 58-8.)  Among other things, Plaintiffs requested "[a] current copy of Nurse Markey's curriculum vitae, including a detailed listing of her education, board certifications, and any other matters relevant to the qualifications of an expert witness who might testify against Nurse Markey as listed in A.R.S. 12-2604."  (*Id.* at 3-4.)

On October 12, 2021, Nurse Markey was deposed.  (Doc. 58-9.)  During the deposition, defense counsel asked: "[D]o you have any additional certifications beyond your degree?"  (*Id.* at 2.)  Nurse Markey responded: "Yes.  I'm certified in psychiatric and mental health through the [ANCC]."  (*Id.* at 2-3.)  Nurse Markey also testified about the continuing education required to maintain her certification.  (*Id.* at 3.)

On October 20, 2021, Defendant produced Nurse Markey's resume.  (Doc. 49 at 6; Doc. 58-10 at 5.)

On October 22, 2021, Plaintiffs produced Nurse Bala's report.  (Doc. 49 at 6.)

In the Court's view, this series of events demonstrates that Plaintiffs proposed their initial expert, Nurse Bala, in good faith.  Between May 2021 and October 2021, defense counsel failed to respond to repeated requests from Plaintiffs' counsel for more information concerning Nurse Markey's credentials.[15]  Given that the first notice Plaintiffs received

---

[15]    During oral argument, defense counsel sought to justify the failure to respond to Plaintiffs' emails by characterizing them as informal discovery requests to which no response was required.  This is a disappointing and unpersuasive justification.  Much time and effort could have been saved in this case had counsel simply responded to the emails

that Nurse Markey was board certified occurred in a deposition less than two weeks before the October 22, 2021 deadline for expert disclosures (Doc. 49-1 at 12-13), and that Plaintiffs did not receive Nurse Markey's resume until *two days* before that deadline (Doc. 49 at 6), it is difficult to assign too much fault to Plaintiffs for failing to seek additional time to secure a similarly qualified expert.

The timing of Defendant's motion also weighs in favor of allowing substitution. Defendant received Nurse Bala's resume, which lists her "licenses and certifications" and includes no mention of any certification related to psychiatric or mental health care, in June 2021. (Doc. 49-1 at 26; Doc. 58-6 at 1.) However, Defendant did not seek relief based on the inadequacy of Nurse Bala's certifications until July 2022. Although that request was timely under the scheduling order, it was long after the deadline for Plaintiffs to identify a new expert with the necessary credentials. *Cf. Ellsworth*, 2018 WL 1784687 at *4 (substitution may be justified where the expert's qualifications were "plainly inadequate in the affidavit" yet the moving party waited to challenge the proposed expert until a later stage of the litigation).[16]

Accordingly, the Court grants Plaintiffs' alternative request to nominate Nurse Puchkors as their standard of care expert. The Court also grants Defendant's alternative request that "it be given an opportunity to depose the new expert . . . [and] have its expert address the new expert's opinions." (Doc. 68 at 3 n.1.)[17]

…

…

---

in a professional manner.

[16]   Even if Defendant assumed that Nurse Bala held a certification in 2019 that was no longer active by 2021, Nurse Bala's certifications at the time of the challenged care are not material. *Awsienko v. Cohen*, 257 P.3d 175, 178 (Ariz. Ct. App. 2011) ("The language of the statute does not require an expert testifying about the standard of care applicable to a board-certified defendant to have been board-certified at the time of the occurrence.").

[17]   Because the Court grants Plaintiffs' alternative request for substitution, the parties' arguments regarding Nurse Weishaar's testimony need not be addressed. However, the Court notes that Nurse Weishaar, who the parties agree is not board certified in psychiatric mental health nursing (Doc. 58 at 8), appears to lack the necessary qualifications under A.R.S. § 12-2604(A)(1) for the same reasons as Nurse Bala.

II.   Summary Judgment

Defendant moves for summary judgment on two grounds.  (Doc. 57.)  First, Defendant argues that Plaintiffs' expert on the standard of care is not qualified under A.R.S. § 12-2604(A)(1) and that, without a qualified expert, Plaintiffs cannot prove the requisite standard of care.  (*Id.* at 5-6.)  Second, Defendant contends that Hager's suicide was an "intervening and superseding act that is the cause of Plaintiffs' injuries" and thus relieves Defendant from liability as a matter of law.  (*Id.* at 7.)

Because the Court has granted Plaintiffs' request to substitute Nurse Puchkors as their standard of care expert, Defendant's first summary judgment argument is denied without prejudice.

Defendant's second argument presents a closer question.  In Arizona, the elements of a medical malpractice action are provided by statute:

> Both of the following shall be necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care:
>
> 1.   The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.
>
> 2.   Such failure was a proximate cause of the injury.

A.R.S. § 12-563.  "Regarding causation, a plaintiff must show 'a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, that produces an injury, in whole or in part, and without which the injury would not have occurred."  *Sampson v. Surgery Ctr. of Peoria, LLC*, 491 P.3d 1115, 1118 (Ariz. 2021) (discussing proximate cause under § 12-563(2)).  As for the concept of intervening cause, the Arizona Supreme Court recently explained:

> An intervening cause is an independent cause that occurs between a defendant's negligent conduct and the final harm and is necessary in bringing about that harm.  It becomes a superseding cause, which relieves the original negligent actor from liability, when "an intervening act of another was unforeseeable by a reasonable person in the position of the original actor and when, looking backward, after the event, the intervening act appears extraordinary."

- 20 -

*Torres v. Jai Dining Services (Phoenix) Inc.*, 497 P.3d 481, 484 (Ariz. 2021) (internal citations omitted).  *See also Rossell v. Volkswagen of Am.*, 709 P.2d 517, 525 (Ariz. 1985) ("It is only when the intervening act is considered superseding cause that the original actor is relieved of liability for his negligence.").

Under Arizona law, the general rule is that "suicide by the injured party is a superseding cause which is neither foreseeable nor a normal incident of the risk created and therefore relieves the original actor from liability for the death resulting from the suicide." *DeMontiney v. Desert Manor Convalescent Ctr. Inc.*, 695 P.2d 255, 259 (Ariz. 1985) (citation omitted).  The so-called "suicide rule" thus short-circuits the proximate cause analysis by presuming that suicide falls outside the realm of reasonable foreseeability as a matter of law.  However, Arizona recognizes two exceptions to this "general rule."[18]

First, liability may exist "when the defendant negligently caused the decedent to suffer delirium or insanity that either prevented him from realizing the nature of his act and the certainty or risk of harm involved therein, or made it impossible for him to resist an impulse caused by his insanity which deprived him of his capacity to govern his conduct in accordance with reason." *Parton v. Jeans*, 2019 WL 6608750, *2 (Ariz. Ct. App. 2019) (cleaned up).  Plaintiffs do not allege that Hager was suffering from delirium or insanity caused by Defendant.  (*See generally* Doc. 1.)  Thus, the first exception is not at issue here.

Second, a "different rule" applies to actors that have "a specific duty of avoiding suicide." *DeMontiney*, 695 P.2d at 259.  The Arizona Supreme Court has addressed this exception in two decisions: *Maricopa County v. Cowart*, 471 P.2d 265, 267 (1970), and *DeMontiney*.  *Cowart* found a "[s]pecific duty of care to avoid suicide" for mental institutions and applied that duty to juvenile homes.  471 P.2d at 267.  *DeMontiney* recognized a specific duty to avoid suicide by a health care facility providing custodial care to a "mental hold" patient known to have suicidal tendencies.  695 P.2d at 259-60.  *See*

---

[18]     A third exception may exist where the decedent falls within the protection of a specific state statute.  *Crown v. Raymond*, 764 P.2d 1146, 1147-49 (Ariz. App. Ct. 1988) (the general suicide rule did not apply to a gun shop owner who sold a weapon to a minor because the injury was foreseeable given that a state statute prohibited the sale, expressing a legislative awareness that children in possession of guns may harm themselves).

*also id.* ("[I]t is the special relationship between two parties that can give rise to a duty to prevent suicide.  When an institution, such as Desert Manor, is charged with the care and custody of persons who it knows will be likely to harm themselves, therefore, that special relationship exists.  Consequently, the institution has the duty to take reasonable steps to prevent suicide.").

Defendant contends the specific duty recognized in *DeMontiney* and *Cowart* is limited to actors who had physical "custody" of the person who committed or attempted suicide.  (Doc. 57 at 8 & n.4 [arguing that because "Mr. Hager was not in the custody of and had not been committed to the VA," "[n]either the VA nor Nurse Markey owed Mr. Hager a specific duty of care"].)  In response, Plaintiffs argue that the VA owed a specific duty of care to Hager, a military veteran seeking mental health treatment who was at risk for suicide, based on its relationship with Hager as his medical provider.  (Doc. 62 at 5-6 ["The Veterans Administration owes a duty to military veterans who need mental health care and who may commit suicide."].)[19]

The scope of the "specific duty" exception to the suicide rule is governed by Arizona law.  "When interpreting state law, a federal court is bound by the decision of the highest state court."  *In re Kirkland*, 915 F.2d 1236, 1238 (9th Cir. 1990).  "If the state's highest court has not decided an issue, it is the responsibility of the federal courts sitting in diversity to predict how the state high court would resolve it."  *Albano v. Shea Homes Ltd. P'ship*, 634 F.3d 524, 530 (9th Cir. 2011) (citation and internal quotation marks omitted).  "The decisions of the state's intermediate appellate courts are data that a federal court must consider in undertaking this analysis."  *Air-Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir. 1989).

Whether the VA has a specific duty to protect mental health patients being seen on an outpatient basis from suicide is a question the Arizona Supreme Court has not yet

---

[19]     The Court acknowledges that it is somewhat unclear whether Plaintiffs are arguing that the VA clinic had a specific duty of care to take reasonable steps to prevent Hager's suicide (in contrast to the general duty of reasonable care that may arise from a doctor-patient relationship).  (*See* Doc. 62 at 5-8.)  The second exception to the suicide rule requires a "[s]pecific duty of care to avoid suicide."  *Cowart*, 471 P.2d at 267.

addressed.  With that said, decisions from the Arizona Court of Appeals provide guidance and largely support Defendant's position that no specific duty arose here due to the absence of a custodial relationship between the VA and Hager.  *See, e.g.*, *Parton*, 2019 WL 6608750 at *2-3 (applying the general rule to preclude a school's liability for bullying that led to a student's suicide); *Cohen v. Maricopa County*, 263 P.3d 61, 62-65 (Ariz. Ct. App. 2011) (affirming the dismissal of a medical malpractice claim against a county-licensed urgent care center that provided "acute psychiatric services" on an outpatient basis, where a patient committed suicide the day after a medical provider at the clinic denied an application to hold the patient pursuant to a mental health detainer and allowed the patient to return home, and explaining that one of the "important distinctions" between the case and *DeMontiney* was that "the patient [in *DeMontiney* was] being involuntarily held in the County's custody," and thus "the County ha[d] the ability to exclusively control the environment surrounding the patient and to control and reduce risk associated with such environment," whereas the patient in the instant case was "out of such controlled environment . . . [and thus] the County ha[d] little practical control over that patient, the patient's environment or the actions of others, and thus ha[d] little to no control over risk");[20] *Pompeneo v. Verde Valley Guidance Clinic Inc.*, 249 P.3d 1112, 1113 (Ariz. App. Ct. 2011) (applying the general rule to preclude an outpatient psychiatric clinic's liability for a murder and subsequent suicide attempt);[21] *Tucson Rapid Transit Co. v. Tocci*, 414

---

[20]     The extent to which *Cohen* was also based on the lack of a contractual relationship between the medical provider and the defendant county (rather than solely the absence of physical custody) is unclear.  *See, e.g.*, 263 P.3d at 65 (describing the "the holding of *DeMontiney* as to non-delegable duty" of care as "limited to its unique setting" and reasoning that "[i]f a county directly contracts with others to provide such care, it has the ability through contract to mandate how the care will be provided, and to control or manage through an indemnity provision or an additional insured clause the risk of harm that might be caused by the negligence of such contracting provider").

[21]     There are reasons to be cautious about reading *Pompeneo* as establishing a bright-line rule against imposing a specific duty to avoid suicide on *any* outpatient treatment provider.  *Pompeneo* involved an extreme series of events—the plaintiff was a recovering addict who, after receiving treatment from the defendant outpatient clinic, murdered his girlfriend and then attempted suicide.  249 P.3d at 1113.  He then filed a medical malpractice action alleging, in relevant part, that he was entitled to damages for his unsuccessful suicide attempt.  *Id.* at 1113-14.  Moreover, *Pompeneo*'s analysis focused on the first exception to the general rule—delirium or insanity caused by the defendant— and did not address the "specific duty" exception.

P.2d 179, 180-85 (Ariz. App. Ct. 1966) (applying the general rule to preclude a bus company's liability where the plaintiff attempted suicide following a bus accident that allegedly caused her to suffer severe depression and noting "the practically unanimous rule . . . that [suicide] is a new and independent agency which does not come within and complete a line of causation from the wrongful act to the death and therefore does not render defendant liable for the suicide").

On the other hand, none of the relevant cases from the Arizona Court of Appeals addressed the specific scenario at issue here—a VA clinic providing mental health treatment to a patient population that is uniquely vulnerable to the risks of suicide. Additionally, several recent decisions by Arizona courts (and courts applying Arizona law) raise questions about whether the bright-line rule that Defendant asks the Court to apply here (*i.e.*, absent a custodial setting, suicide always constitutes a superseding cause that precludes liability unless the defendant caused the decedent's underlying mental condition) remains the law in Arizona. For example, in *Smith v. Chandler*, 794 F. App'x 594 (9th Cir. 2019), the plaintiff sued the city for injuries sustained when he attempted suicide during an encounter with the city's police officers. *Id.* at 595.[22] The "district court . . . held that, as a matter of Arizona law, Appellant's suicide attempt superseded the City's alleged negligence as the cause of Appellant's injuries because Officer Smith did not cause Appellant's underlying mental condition" but the Ninth Circuit reversed, holding that the district court "failed to analyze Appellant's claim under applicable Arizona tort law relating to applicable duty and foreseeability concepts. Under Arizona law, whether an event . . . constitutes a superseding cause is ordinarily a question of fact for the jury to decide." *Id.* at 595-96 (citations omitted). Admittedly, *Smith* is an unpublished decision and is factually distinguishable from this case, but it nonetheless provides some indication that Arizona law on this issue does not establish as strict a rule as Defendant contends (and

---

[22]   Specifically, the suicide attempt occurred in the presence of law enforcement officers while the plaintiff was physically surrounded by officers (one of whom deployed several beanbag rounds at him). *Smith v. City of Chandler*, 2014 WL 1493004, *2 (D. Ariz. 2014). It does not appear the plaintiff was formally in the custody of the officers at the time of the suicide attempt.

that a finding of liability may be possible even absent a custodial relationship).

Similarly, in *Delgadillo v. BNSF Ry. Co.*, 2022 WL 4305625 (D. Ariz. 2022), the decedent committed suicide by laying in front of an oncoming train. *Id.* at *1. In the ensuing wrongful death action brought by the decedent's sister, the railroad sought summary judgment under *Cowart*, arguing that "Decedent was committing suicide, thus severing the causal chain and barring liability." *Id.* at *2. The district court disagreed and denied the summary judgment motion, holding that "it's not surprising or unpredictable that a motionless object will block ground-level tracks." *Id.* Although *Delgadillo* (like *Smith*) is not binding here, involved dissimilar facts, and did not specifically address whether the duty/causation analysis turned on the presence or absence of physical custody, it is another example of a recent decision that casts some doubt on Defendant's position.

Separately, and perhaps more important, the Arizona Court of Appeals recently questioned the wisdom of the common-law suicide rule and invited the Arizona Supreme Court to revisit it:

> [W]e believe our supreme court should revisit the aging majority rule. The majority rule draws from society's historical view of suicide as sinful and immoral, and its historical classification as a felony. But societal and legal views of suicide have evolved—our understanding of mental health has changed, moral perspectives on suicide are more diverse, and the classification of suicide as a crime has long been discarded. The majority rule fails to consider those changes. Further, it fails to account for modern legislative willingness to recognize that wrongful conduct which may increase the risk of suicide . . . should be addressed by the law. . . . [T]he majority rule effectively short-circuits any real analysis into whether the decedent's suicide was within the scope of foreseeable risk created by the defendant's negligence. The majority rule therefore may produce anomalous results, precluding relief for suicide when it is the precise harm that a reasonable person could foresee. . . . Accordingly, some courts are beginning to move beyond rote application of the suicide rule and its exceptions and toward a more traditional scope-of-risk analysis, recognizing that the traditional analysis is sufficient to address the vast majority of these cases without relying upon the fiction that suicide is a superseding cause as a matter of law. We believe that these courts have taken the correct approach, but we cannot follow the modern approach until and unless our supreme court changes Arizona law.

*Parton*, 2019 WL 6608750 at *2-3 (internal citations and quotation marks omitted). Although the Arizona Supreme Court did not accept this invitation—in November 2020, it denied the petition for review in *Parton*—the Court does not view this outcome as a

conclusive determination that the Arizona Supreme Court would also reject the position that Plaintiffs advance here.  For one thing, the facts of this case differ from the facts of *Parton* and, arguably, present a more compelling vehicle for revisiting the wisdom of the "aging majority rule."  In the Court's estimation, a VA clinic providing mental health treatment to veterans suffering from PTSD and other mental health maladies qualifies as an almost quintessential example of a setting where the risk of suicide is foreseeable.

Additionally, since it denied the petition for review in *Parton*, the Arizona Supreme Court issued another ruling that touches upon what it means for a cause to be superseding under Arizona law.  *Torres*, a dram-shop liability case, raised the question whether a club could be liable for a car accident that occurred when an intoxicated patron left the club, drove home, took a short nap, and then, while driving a friend home later that night, still intoxicated, hit and killed two third parties.  497 P.3d at 482-83.  The Arizona Court of Appeals held that the club could not be liable as a matter of law because once the driver "had 'safely reached his residence, gone to bed, and fallen asleep, with no known compelling reason to leave,' his independent decision to leave and drive his truck was an intervening and superseding cause that broke the chain of proximate causation." *Id.* at 483 (citation omitted).  The Arizona Supreme Court reversed, holding that whether the decision by the intoxicated patron to resume driving after reaching home was a superseding cause as a matter of law depended on "the scope of risk in dram shop cases." *Id.* at 484. Specifically, the Court held that if an intervening cause falls within the scope of the original risk created by the negligent conduct (*i.e.*, the foreseeable risk), it is not a superseding cause. *Id.* at 484-85.  *Torres* suggests that Arizona law in this area may be in flux, and its focus on foreseeability potentially weighs against maintaining a bright-line rule barring liability for injuries caused by suicide (or suicide attempts) against outpatient healthcare providers treating patients at risk for suicidal behavior.[23]

Against this backdrop, the Court is reluctant to find, as a matter of Arizona law, that

---

[23]     On the other hand, *Torres* could also be interpreted as a narrow decision that only affects the rules in dram-shop cases.

the VA has no specific duty to protect a veteran seeking mental health treatment from suicide simply because the treatment is being provided on an outpatient basis (particularly where, as here, the veteran had a history of suicidal ideation).[24]  The VA provides mental health care to a population that is particularly vulnerable to the risk of suicide.[25]  Given the importance of this issue and the presence of nonfrivolous reasons to believe the law may not be as settled as Defendant portrays it to be, and with recognition that it should be the Arizona courts (not federal courts applying Arizona law) who resolve weighty and potentially unsettled state-law issues, the Court would be inclined to certify the question to the Arizona Supreme Court.  "Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save time, energy, and resources and hel[p] build a cooperative judicial federalism."  *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 77 (1997) (citations and internal quotation marks omitted).  *See also Benson v. Casa de Capri Enterprises, LLC*, 980 F.3d 1328, 1332 (9th Cir. 2020) ("In the absence of any apparent controlling precedent, and out of respect for Arizona courts and their preeminent role in interpreting Arizona law, we believe it most suitable to certify this issue to the highest court of the state whose law is in question.") (citation and internal quotation marks omitted).

The Court also concludes, however, that it would be premature to make a certification request at this time.  The Arizona Supreme Court may accept a request for certification only if the question to be resolved "may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of the supreme court and the intermediate appellate courts of this state."  A.R.S. § 12-1861.  The latter part of this test seems satisfied here

---

[24]     To be clear, the Court does not find that the Nurse Markey acted negligently or that Hager's suicide was a foreseeable risk of such negligence.  Instead, the Court questions whether the mere fact that Willow Clinic is an outpatient facility bars (or should bar) any potential for liability as a matter of law.

[25]     *See, e.g.*, Mark S. Kaplan, *Suicide Risk and Precipitating Circumstances Among Young, Middle-Aged, and Older Male Veterans*, 102 AM. J. PUB. HEALTH S131, S133 (2012) ("The risk of suicide among male veterans compared with nonveterans was statistically significantly greater in all age groups, except for those aged 65 years and older."), *available at* https://pubmed.ncbi.nlm.nih.gov/22390587/.

because, as discussed above, the specific duty issue is a "novel or unsettled question[] of state law" as to which "there is no controlling precedent" from the Arizona courts. *Arizonans for Off. Eng.*, 520 U.S. at 77; A.R.S. § 12-1861. But as for the former part of the test, it is not yet clear whether the disputed issue of law is determinative of Plaintiffs' claims. Defendant contends it is entitled to summary judgment even under "a standard duty and causation analysis" because Plaintiffs have provided insufficient evidence that Nurse Markey was negligent and that such negligence caused Hager's suicide. (Doc. 68 at 8-11.) Additionally, as discussed in Part I above, the Court has now authorized Plaintiffs to designate a new expert, Nurse Puchkors, on these topics and to reopen discovery to allow Defendant to depose Nurse Puchkors. Depending on how that process goes, Defendant may have additional grounds for seeking summary judgment that are not dependent on the resolution of the legal question the Court would otherwise be inclined to certify. Under these circumstances, it makes sense to wait for those processes to play out before making any certification request.[26]

…

…

…

…

…

…

…

…

…

---

[26] The Court further notes that, if it were to make a certification request at the conclusion of those processes but the Arizona Supreme Court were to deny the certification request, it would proceed to make its best "*Erie* guess" on the disputed issue of Arizona law and then resolve Defendant's renewed summary judgment motion on the basis of that determination. *Thornell v. Seattle Service Bureau, Inc.*, 742 F. App'x 189, 190-91 (9th Cir. 2018) (where the Washington Supreme Court declined to grant a certification request as to a particular issue, "we must engage in an '*Erie* guess' as to how that court would resolve [that] issue").

Accordingly,

**IT IS ORDERED** that:

(1)     Defendant's motion to disqualify Nurse Bala as Plaintiffs' standard of care expert (Doc. 49) is **granted**.

(2)     Plaintiffs' request to substitute Nurse Puchkors as their standard of care expert (Doc. 58) is **granted**.

(3)     Defendant's corresponding request to reopen discovery (Doc. 68) is **granted**.

(4)     Defendant's motion for summary judgment (Doc. 57) is **denied without prejudice**.

(5)     The parties shall meet and confer about a schedule for completing the reopened discovery process and allowing Defendant to file a successive motion for summary judgment.  The parties shall file a joint notice setting forth their agreed-to schedule (or, if there is no agreement, their competing positions) within 14 days of the issuance of this order.  Defendant's successive summary judgment motion may reassert the same specific duty/superseding cause argument that appears in Part III.B of Defendant's current summary judgment motion.

Dated this 14th day of February, 2023.

Dominic W. Lanza
United States District Judge

- 29 -