**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sarah Hager, et al., | No. CV-20-02275-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| United States of America, | |
| Defendant. | |

In June 2019, Edward Michael Hager ("Hager") sought mental health counseling at a clinic operated by the Department of Veterans Affairs ("VA") in Gilbert, Arizona. Later that day or the following day,[1] Hager committed suicide. Hager's spouse, Sarah Hager, who is acting on behalf of herself and the statutory beneficiaries of Hager (collectively, "Plaintiffs"), brought suit against the United States ("Defendant") under the Federal Tort Claims Act ("FTCA"), alleging that the nurse who treated Hager at the VA clinic committed malpractice.

Now pending before the Court is Defendant's renewed motion for summary judgment. (Doc. 82.) For the following reasons, the motion is granted.

## BACKGROUND

The following facts are derived from the parties' submissions and the record evidence and are uncontroverted unless otherwise noted. Additional facts bearing on the parties' specific summary judgment arguments are addressed in the Discussion portion of

---

[1] "No one knows when Mr. Hager shot himself." (Doc. 82 at 4.)

this order.

I.      Relevant Factual Background

Hager served in the United States Army from 2002 to 2006.  (Doc. 57-1 at 18.)  He was deployed to Iraq for 15 months in 2003 and 2004, during which time he "[s]aw friends die, was shot at and sustained several blast injuries and brain concussion [sic]."  (Doc. 63 at 13.)

Hager's medical records reveal a series of mental health problems following his return to civilian life, including diagnoses of post-traumatic stress disorder ("PTSD") and a traumatic brain injury ("TBI").  (Doc. 57-1 at 5 ¶ 12.)  In 2008, he was admitted for inpatient psychiatric care after his wife reported that he had written a suicide note.  (Id. at 13, 18.)[2]  In 2008 or 2009, he began suffering from "paranoia."  (Id.)[3]

On October 23, 2008, Hager underwent a neuropsychological screen.  (Doc. 63 at 14.)  The referral for the screen stated that Hager "reported progressively worsening problems with forgetfulness, attention/concentration, word finding and emotional control following his 2004 return from Iraq. . . .  He also described significant depressive and anxious symptomatology that is interfering with his ability to sleep and function socially."  (Id.)  The assessment report from the screen, entered on October 27, 2008, described Hager's "verbal and visual memory abilities" as "compromised."  (Id. at 15 ["Retention of both verbal and visual information following a brief delay was severely impaired . . . ."].)  The report also stated that Hager reported a variety of psychiatric symptoms (e.g., hypervigilance, frequent nightmares, and significant irritability) but that, "[i]nterestingly, when later asked to fill out self report measures of mood symptoms, his endorsement indicated only mild symptoms of depression and anxiety . . . .  Inconsistency in . . . reports likely indicates that the inventories represent an underestimation of his current symptoms."

---

[2]      Hager described this incident to a medical provider in 2013 but stated he did not recall writing the note.  (Id. at 13.)

[3]      The medical notes from the 2013 visit provide: "[Hager] states he's had paranoia since 08-09 when he was deployed."  (Id. at 13.)  This chronology appears to be inaccurate, as Hager was deployed during 2003 and 2004 and was discharged in 2006.  It is therefore possible the paranoia began before 2008.  This distinction is not material to the analysis here.

(*Id.* at 16.)  The report concluded that Hager "reported a considerable amount of psychiatric problems that are consistent with his history of PTSD and [a]lcohol abuse."  (*Id.*)

On November 10, 2008, Hager saw a psychiatrist for symptoms related to his PTSD and TBI.  (*Id.* at 12-13.)  At that time, Hager was experiencing "nightmares of combat," trouble sleeping, anxiety about crowds, and "flashbacks when . . . driving."  (*Id.* at 13.)  The psychiatrist reported that Hager "has symptoms of post concussion syndrome, post concussive headache and PTSD," had "mild irritability," and was "mildly anxious."  (*Id.*)  The psychiatrist also reported Hager's substance abuse and family history—his "[f]ather was [an] alcoholic, is in prison for manslaughter" and Hager "has infrequent contact with him."  (*Id.*)  During the appointment, Hager did not express suicidal ideation or a plan or an intent to harm others.  (*Id.*)

On June 17, 2013, Hager presented at a VA clinic in Phoenix and reported suffering from "increasing paranoia" and sleep deprivation.  (Doc. 57-1 at 13.)  The paranoia included suspicions that his wife was cheating on him, "thoughts that his boss [was] not calling him," and "paranoia that the authorities are watching him because of a DVD of possible pornography that didn't belong to him and he thinks was planted on him."  (*Id.*)  Hager also thought "he was poisoned as he had blood in his urine and stool and chest pain."  (*Id.* at 18.)[4]  He reported that he felt "hopeless about the present/future."  (*Id.* at 16-17.  *See also id.* at 22 [stating that Hager felt "[l]ittle interest or pleasure in doing things" and "down, depressed, or hopeless" for several days]; *id.* [stating that Hager's screening assessment was "suggestive of moderately severe depression"].)  Further, the provider noted that Hager's gun ownership "elevate[d] [his] suicide risk."  (*Id.* at 18.)  However, Hager denied past or present suicidal ideations or attempts.  (*Id.* at 16-17.)  The provider estimated Hager's risk level for suicide was "[l]ow: [d]esire or [c]apability alone."  (*Id.* at

---

[4]     The day before, on June 16, 2013, Hager presented at an emergency room with chest pain.  (*Id.* at 18; Doc. 63 at 11.)  The notes from that visit indicate a friend reported that Hager's wife was due to deliver their first baby on June 15, 2013, and that Hager believed the baby's sex had been changed inside the womb.  (Doc. 63 at 11.)  Hager "declined in-patient admission, [and] was advised to follow up at the mental health clinic and did so the following day."  (Doc. 57-1 at 5 ¶ 10.)

19 ["There is a willingness to engage in treatment.  Has some social support [f]rom family/friends.  Has some suicidal ideation, but is limited in [i]ntensity and duration."].) The provider determined that Hager was "[a]dequate for outpatient treatment." (*Id.* at 15.) He was scheduled to see a psychiatrist within the following two weeks.  (*Id.* at 5 ¶ 12.) However, he did not keep the appointment.  (*Id.*)

Six years later, on June 24, 2019, Hager presented as a walk-in patient at the VA's Willow Clinic in Gilbert, Arizona and requested counseling services.  (*Id.* at 4 ¶ 4, 6 ¶ 14.)[5] A medical support assistant, Christian Underwood ("MSA Underwood"), took Hager's vital signs and administered the Patient Health Questionnaire ("PHQ-2+I9"), "which is the standard depression and primary suicide risk screen," as well as "the standard PTSD and primary suicide risk screen" ("PC-PTSD-5+I9").  (*Id.* at 4 ¶ 7, 6 ¶¶ 16-17.)[6]  "Depending on the Veteran's responses [to the risk screens], the computer determined whether the Veteran was positive for depression and/or PTSD." (*Id.* at 4 ¶ 7.)

On the PC-PTSD-5+I9, Hager scored a 0 on the suicide screen, which indicates a "negative screen for risk of suicide over the last 2 weeks," and a 2 on the PTSD screen, "which indicates a negative screen for PTSD in the past month." (*Id.* at 31, capitalization omitted.)  On the PHQ-2+I9, Hager scored a 2 on the depression screen, "which indicates a negative screen on the depression scale over the past 2 weeks," and a 0 on the suicide screen, "which indicates a negative screen for risk of suicide over the past 2 weeks." (*Id.* at 32, capitalization omitted.)[7]

Next, Hager was seen by the triage nurse.  (*Id.* at 4 ¶¶ 4-5.)  At that time, William

---

[5] "Between 2013 and 2019, the only treatment [Hager] sought at the VA was in March 2016, when he presented to the emergency department complaining of a burning sensation in his chest and chest pain lasting four months.  He was given Pepcid, which resolved the issue, and was released." (*Id.* at 5-6 ¶ 13.)

[6] MSA Underwood did not receive "training in counseling or psychology or psychiatry." (Doc. 82-1 at 55.)

[7] The progress notes from the PHQ-2+I9 and PC-PTSD-5+I9 tests, as well as the Columbia Suicide Severity Rating Scale ("C-SSRS") test discussed *infra*, provided that "[i]nformation contained in this note is based on a self-report assessment and is not sufficient to use alone for diagnostic purposes.  Assessment results should be verified for accuracy and used in conjunction with other diagnostic activities." (*Id.* at 30, 32.)

Weishaar ("Nurse Weishaar") worked as the regular triage nurse at the Willow Clinic. (Doc. 63 at 25.)  When Nurse Weishaar wasn't working, "[t]he other nurses in the Willow Clinic rotated to cover [the] triage position." (Doc. 57-1 at 4 ¶ 5.)  On June 24, 2019, Vicky Markey ("Nurse Markey") was covering triage.  (*Id.*)[8]  At all relevant times, Nurse Markey worked as a mental health nurse at the Willow Clinic.  (*Id.* at 3 ¶ 3.)

During the June 24, 2019 consultation with Nurse Markey, Hager requested counseling, explaining: "I am feeling anxious and need some counseling.  My wife and kids are gone for two weeks and I don't know what to do with myself." (*Id.* at 26.)[9]  Nurse Markey stated that "Hager seemed sad during the appointment, but he was forthright and matter of fact when answering my questions."  (*Id.* at 7 ¶ 27.)  She reported that "Hager was not delirious, delusional, psychotic, insane, or otherwise of unsound mind."  (*Id.* at 7 ¶ 28.)  Hager explained to Nurse Markey that he had "hardly slept in days" and "hate[d] being alone and in [his] own head."  (*Id.* at 26.)  He also mentioned that he had recently stopped running a website for veterans because it was getting too "dark" and "bringing up past memories" and that, as a result, he had "too much time on his hands and [was] thinking too much." (*Id.*)  Hager reported that he was not taking any prescribed medications for his mental health and that he did not want to take any medications, but rather he "just want[ed] to start talking to someone." (*Id.*)  Hager also reported that he "[u]ses marijuana to help with sleep and nightmares and finds it effective"; "drinks a couple times a year and drinks till he passes out"; and "uses tobacco every day . . . within 30 minutes of waking up." (*Id.* at 26-27.)  Nurse Markey expressed concern over Hager's alcohol use and "[a]dvised [Hager] to abstain from drinking alcohol due to contraindications."  (*Id.* at 25.)  He "decline[d] referral for alcohol use assessment or treatment."  (*Id.*)  He also declined behavior counseling and medications to assist him with quitting smoking.  (*Id.* at 28.)

Nurse Markey administered the C-SSRS, which is "a standard suicide screening tool

---

[8]     During her deposition in this case, when asked whether she had "receive[d] any instruction from the [VA] about patient care during triage," Nurse Markey responded that she "spent some time with a triage nurse at Jade Opal and then again with Bill at The Willow Clinic." (Doc. 63 at 21.)

[9]     Hager reported that his "[w]ife, family and friends are his support system."  (*Id.*)

widely used in the mental health and primary care settings," and also completed a suicide risk assessment ("SRA"), "which is a clinical evaluation to determine the nature and degree of suicide risk/probability." (*Id.* at 6-7 ¶ 20.) "The C-SSRS and SRA indicated that [Hager] was at low risk for suicide." (*Id.* at 7 ¶ 20.) In relevant part, Hager reported that in the past month, "he had never wished that he was dead or that he could go to sleep and not wake up," did not have "any actual thoughts of killing himself," had not considered suicide, and he had never prepared or attempted to commit suicide. (*Id.* at 7 ¶¶ 21-23.) Nurse Markey then asked Hager "whether he had firearms in his home" and, if so, whether "he would consider removing his firearms from his residence." (*Id.* at 7 ¶¶ 24-25.) Hager "agreed to take [his firearms] to his father's house, stating 'I am not suicidal or anything but it can only be a smart move to get them out of my house.'" (*Id.* at 7 ¶ 25; *id.* at 26.) Hager also represented that "he intended to stay with his father while his family was out of town." (*Id.* at 7 ¶ 25.)

Nurse Markey "scheduled [Hager] for an appointment with . . . a psychiatrist at the Willow Clinic on July 24, 2019." (*Id.* at 9 ¶ 40.) She also provided him with information about other VA resources, including the Mesa Vet Center, "a small, non-medical counseling center staffed by counselors [that] offers on[e]-on-one counseling and group sessions." (*Id.* at 10 ¶¶ 43, 45-47. *See also id.* at 10 ¶ 45 ["I also gave [Hager] information about the emergency services available through the VA and instructed him to call 911 or the Veterans Crisis Line if he was having thoughts of suicide or homicide or was otherwise in mental distress."].) Hager said he would "check [the Mesa Vet Center] out tomorrow." (*Id.* at 26.)

After the consultation with Nurse Markey, Hager called his stepfather, whom he asked to "stop by after work to pick up his weapons." (*Id.* at 40.) Around 5:00 pm, Hager's stepfather and mother went to Hager's house. (*Id.*) During the visit, Hager told his mother, Donna Fett, that the VA had "suggested that a family member take his weapons." (*Id.* at 41.) His stepfather retrieved the guns, which were "all packed up" in a bag, from the master bedroom. (*Id.* at 41-43.) After about an hour and a half, his parents left. (*Id.* at 42.) Fett

did not "believe that [Hager] was suicidal" at the time.  (*Id.* at 43-44.)[10]

The following day, Hager was found dead in his home from a self-inflicted gunshot wound.  (*Id.* at 44-45.)

II.    Procedural History

On November 24, 2020, Plaintiffs initiated this action.  (Doc. 1.)

On July 1, 2022, Defendant moved to disqualify Plaintiffs' then-standard of care expert, Boualay Bala ("Nurse Bala").  (Doc. 49.)

On July 29, 2022, Defendant moved for summary judgment.  (Doc. 57.)

On February 14, 2023, the Court granted Defendant's motion to disqualify Nurse Bala and denied Defendant's motion for summary judgment without prejudice.  (Doc. 72.) As for the expert issue, the Court concluded that Nurse Markey was "acting within her specialty as a psychiatric mental health nurse when she saw Hager" and was a Psychiatric Mental Health Nurse-Board Certified ("PMH-BC"), having been certified by the American Nurses Credentialing Center ("ANCC").  (*Id.* at 9-15.)  Given those conclusions, the Court determined that the requirements of A.R.S. § 12-2604(A)(1) applied—and, thus, Plaintiffs' expert witness had to be "board certified in [the same] specialty or claimed specialty" as Nurse Markey.  (*Id.* at 12.)  Because Nurse Bala was not board certified in psychiatric mental health nursing, the Court disqualified her as Plaintiffs' standard of care expert.  (*Id.* at 12, 15.)  However, the Court granted Plaintiffs' request to substitute Rebecca Puchkors ("Nurse Puchkors")—"a registered nurse with a PMH-BC certification from the ANCC"— as their standard of care expert.  (*Id.* at 15-19.)  The Court explained that "Plaintiffs proposed their initial expert, Nurse Bala, in good faith.  Between May 2021 and October 2021, defense counsel failed to respond to repeated requests from Plaintiffs' counsel for more information concerning Nurse Markey's credentials.  Given that the first notice Plaintiffs received that Nurse Markey was board certified occurred in a deposition less than

---

[10]    Fett and Hager's stepfather also visited Hager at his home on Saturday, June 22, 2019, and Sunday, June 23, 2019.  (*Id.* at 38-39.)  Fett testified that although she "was having concerns [about Hager's mental health] all weekend," she did not "have any concerns about [his] mental health on Saturday" and she did not have "any specific concerns about [her] son when [she] saw him on Sunday."  (*Id.*)

two weeks before the October 22, 2021 deadline for expert disclosures, and that Plaintiffs did not receive Nurse Markey's resume until two days before that deadline, it is difficult to assign too much fault to Plaintiffs for failing to seek additional time to secure a similarly qualified expert." (*Id.* at 17-19, footnote and internal citations omitted.)  The Court held that "[t]he timing of Defendant's motion also weighs in favor of allowing substitution," given that Defendant filed the motion to disqualify Nurse Bala "long after the deadline for Plaintiffs to identify a new expert with the necessary credentials." (*Id.* at 19.)

Next, the Court addressed Defendant's two bases for seeking summary judgment— (1) Plaintiffs failed to establish the standard of care with admissible expert testimony; and (2) Hager's suicide was, as a matter of law, a superseding and intervening cause relieving Defendant of liability. (*Id.* at 20-29.)  Because the Court had just allowed Plaintiffs to substitute Nurse Puchkors as their standard of care expert, the Court denied Defendant's first argument without prejudice. (*Id.* at 20.)  As for the second argument, the Court explained that "[u]nder Arizona law, the general rule is that 'suicide by the injured party is a superseding cause which is neither foreseeable nor a normal incident of the risk created and therefore relieves the original actor from liability for the death resulting from the suicide.' . . .  However, Arizona recognizes two exceptions to this 'general rule.'" (*Id.* at 21, citation omitted).  The Court concluded that "the first exception is not at issue here" because "Plaintiffs do not allege that Hager was suffering from delirium or insanity caused by Defendant." (*Id.*)  As for the second exception, the Court explained that "[w]hether the VA has a specific duty to protect mental health patients being seen on an outpatient basis from suicide is a question the Arizona Supreme Court has not yet addressed. . . .  Given the importance of this issue and the presence of nonfrivolous reasons to believe the law may not be as settled as Defendant portrays it to be, and with recognition that it should be the Arizona courts (not federal courts applying Arizona law) who resolve weighty and potentially unsettled state-law issues, the Court would be inclined to certify the question to the Arizona Supreme Court. . . .  The Court also concludes, however, that it would be premature to make a certification request at this time. . . .  Defendant may have additional

grounds for seeking summary judgment that are not dependent on the resolution of the legal question the Court would otherwise be inclined to certify." (*Id.* at 22-28.) Thus, the Court reopened discovery for the limited purpose of allowing additional discovery concerning Nurse Puchkors and authorized Defendant to file a renewed motion for summary judgment following the completion of that process. (*Id.* at 29.)

On June 30, 2023, Defendant filed the pending renewed motion for summary judgment. (Doc. 82.) The motion later became fully briefed. (Docs. 85, 88.)

On February 9, 2024, the Court issued a tentative ruling. (Doc. 90.)

On February 21, 2024, the Court heard oral argument. (Doc. 91.)

**DISCUSSION**

I.   Legal Standard

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have

1   enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

2   *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . .

3   [the] moving party carries its burden of production, the nonmoving party must produce

4   evidence to support its claim or defense."  *Id.* at 1103.

5       "If the nonmoving party fails to produce enough evidence to create a genuine issue

6   of material fact, the moving party wins the motion for summary judgment."  *Id.*  There is

7   no issue for trial unless enough evidence favors the non-moving party.  *Anderson v. Liberty*

8   *Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable or is not

9   significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal

10   citations omitted).  At the same time, "[t]he evidence of the non-movant is to be believed,

11   and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  "[I]n ruling on a

12   motion for summary judgment, the judge must view the evidence presented through the

13   prism of the substantive evidentiary burden."  *Id.* at 254.  Thus, "the trial judge's summary

14   judgment inquiry as to whether a genuine issue exists will be whether the evidence

15   presented is such that a jury applying that evidentiary standard could reasonably find for

16   either the plaintiff or the defendant."  *Id.* at 255.

17   II.   <u>Medical Malpractice</u>

18       "The Federal Tort Claims Act (FTCA) allows a plaintiff to bring certain state-law

19   tort suits against the Federal Government."  *Brownback v. King*, 141 S. Ct. 740, 745 (2021).

20   *See also* 28 U.S.C. §§ 1346(b)(1), 2674.  FTCA claims are "governed by the substantive

21   law of the place where the act or omission complained of occurred."  *Yako v. United States*,

22   891 F.2d 738, 745 (9th Cir. 1989).  *See also* 28 U.S.C. § 1346(b)(1).

23       Here, Plaintiffs assert three FTCA claims based on Arizona's law of medical

24   malpractice: medical negligence, wrongful death, and vicarious liability.  (Doc. 1 ¶¶ 1, 50-

25   69.)[11]  In Arizona, the elements of a medical malpractice action are provided by statute:

26

27   [11]    A.R.S. § 12-561(2) defines "[m]edical malpractice action" as "an action for injury
     or death against a licensed health care provider based upon such provider's alleged
28   negligence, misconduct, [or] errors or omissions . . . in the rendering of health care, medical
     services, nursing services or other health-related services . . . ."

- 10 -

Both of the following shall be necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care:

1.    The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.

2.    Such failure was a proximate cause of the injury.

A.R.S. § 12-563.

III.    <u>Standard Of Care—Nurse Puchkors</u>

A.    **Nurse Puchkors's Standard-Of-Care Opinions**

As part of the reopened discovery proceedings, Nurse Puchkors issued a one-page report. (Doc. 85-1 at 6.) There, Nurse Puchkors opined in relevant part as follows: "Nurse Markey fell below the standard of care. The [C-SSRS] is not meant to be comprehensive. Mr. Hager's statements, in combination with his medical history, did not match his answers on the [C-SSRS]. Suicide assessment is a risk formulation. Mr. Hager had a number of significant risk factors for suicide including a [TBI] which causes impulsivity; anxiety; hopelessness; sleeplessness; substance abuse; lethal means; and his support system (his family) being out of town. Following triage, Mr. Hager should have had a comprehensive safety plan implemented that included the input of family members, if at all possible; and Mr. Hager should have had a comprehensive assessment by a competent provider that same day, if possible." (*Id.*)

Following the issuance of her report, Nurse Puchkors was deposed. (Doc. 82-1 at 6-44.) At the outset of her deposition, Nurse Puchkors was asked to "describe . . . [her] opinions with respect to the deficiencies in [N]urse Markey's care." (*Id.* at 23.) Nurse Puchkors responded: "[T]here were deficiencies in the assessment; including mental status, suicide risk assessment and formulation, and intervention." (*Id.*) Nurse Puchkors then added: "Communication. . . . Communication with other providers. And communication in the documentation of that assessment and interventions." (*Id.* at 24.) Later, when asked

whether "the standard of care require[d] that [N]urse Markey have performed and charted a mental status exam on every patient that she saw," Nurse Puchkors stated that "[i]t should have been the standard of her assessment, yes." (*Id.* at 25-26.)  Additionally, when asked whether there were "other deficiencies or other breaches of the standard of care" beyond the asserted "deficiencies in [Nurse Markey's] assessment of mental status, suicide risk assessment, and communication with other providers," Nurse Puchkors stated: "Well, in review of the records, besides those breaches, the interventions for suicide prevention and discharge were not in place." (*Id.* at 27-28.)

### B.    Overview Of The Parties' Arguments

In the renewed summary judgment motion, Defendant construes Nurse Puchkors's report and deposition testimony as identifying four purported breaches of the standard of care by Nurse Markey: (1) failing to perform, and failing to document that she had performed, a mental status examination; (2) failing to perform, and failing to document that she had performed, an SRA; (3) failing to develop a safety plan and, relatedly, allowing Hager to return to an empty house with firearms; and (4) failing to communicate her concerns to interdisciplinary team members or refer Hager for a same-day assessment by another provider.  (Doc. 82 at 6-10.)  Defendant then raises an array of arguments as to why those assertions should be deemed insufficient to meet Plaintiffs' burden of proof under A.R.S. § 12-563.  (*Id.*)

Unfortunately, Plaintiffs' response brief offers only a cursory defense of the sufficiency of Nurse Puchkors's opinions.  First, Plaintiffs assert that "[t]he Plaintiffs' expert establishes a breach of the standard of care" without providing any supporting explanation.  (Doc. 85 at 3.)  Then, in a two-paragraph section of the brief falling under the heading "Nurse Puchkors on the standard of care," Plaintiffs simply summarize certain portions of Nurse Puchkors's deposition testimony before analogizing Nurse Markey to "a dermatologist [who] would tell a skin cancer patient to go sit in the sun." (*Id.* at 4.)  The remainder of Plaintiffs' response brief addresses other issues.  (*Id.* at 5-13.)

In reply, Defendant notes that although Plaintiffs "assert" that the standard-of-care

challenge "is easily defeated by the evidence," Plaintiffs "then fail to cite any evidence." (Doc. 88 at 1.)  Defendant then elaborates upon some of the arguments regarding Nurse Puchkors raised in its motion.  (*Id.* at 1-3.)

From the Court's perspective, this briefing sequence has greatly complicated the task of analyzing the sufficiency of Nurse Puchkors's standard-of-care opinions. Nevertheless, in the subparts that follow, the Court has endeavored to evaluate the sufficiency of each of those opinions.

### C.    Mental Status Assessment

Nurse Puchkors testified that "there were deficiencies in the assessment; including mental status" (Doc. 82-1 at 23) and then elaborated that Nurse Markey's evaluation of Hager fell below the standard of care because Nurse Puchkors "[did not] see indications of the components of a mental status exam in [Nurse Markey's] documentation" (*id.* at 25). When asked whether the standard of care required Nurse Markey to "perform[] and chart[] a mental status exam on every patient that she saw," Nurse Puchkors responded that "[i]t should have been the standard of her assessment, yes."  (*Id.* at 25-26.  *See also id.* at 26 [Q: "[D]oes the standard of care require that a mental status exam be performed every time a nurse sees a mental health patient?"  A: "It should be."].)  Nurse Puchkors further opined that "[a]s a psychiatric nurse, your mental status exam is a piece of your assessment that is important in doing—you know, in knowing what's going on with your patient."  (*Id.* at 26.)[12]

As an initial matter, the Court acknowledges that Nurse Puchkors's use of the phrases "should have" or "should be" to describe Nurse Markey's responsibility to perform and chart a mental status assessment—rather than explicitly affirming that performing and charting a mental status assessment is required under the standard of care—might imply that such conduct is a mere recommendation or best practice, not a requirement.  However,

---

[12]    During the deposition, Nurse Puchkors also testified that a nurse is required to perform and chart a mental health status assessment if the nurse is providing ongoing counseling services to the patient.  (*Id.* at 26.)  This statement is inapplicable to Hager because Nurse Markey was not providing ongoing counseling services to him.

Defendant does not seem to raise such an objection to this aspect of Nurse Puchkors's opinion and the Court concludes that any such challenge would be unavailing.  "The law doesn't require a medical expert to recite a specific incantation, but it does require the expert to at least opine as to the standard of care and that the nonparty's conduct fell below it."  *Buffington v. United States*, 2022 WL 14640030, *2 (D. Ariz. 2022).  *See also Windhurst v. Arizona Dep't of Corr.*, 2021 WL 4465526, *6 (Ariz. Ct. App. 2021) ("[T]o withstand summary judgment, Windhurst was not required to use magic words to establish that Corizon had a duty and breached it."); *Irizarry-Pagan v. Metro Santurce, Inc.*, 2022 WL 4243567, *4 (D.P.R. 2022), *report and recommendation adopted*, 2022 WL 3909158 (D.P.R. 2022) ("A doctor testifying as an expert witness may sometimes imply a standard of care in their testimony without articulating the magic words, or in other words directly referencing a standard of care . . . .") (cleaned up).  Here, when all reasonable inferences are resolved in Plaintiffs' favor, a reasonable factfinder could construe Nurse Puchkors's testimony as setting forth the opinion that performing and charting a mental status assessment falls within the standard of care.  In part, this is because her testimony came in response to questions specifically asking what the standard of care entails.  (Doc. 82-1 at 25-26.)  Admittedly, though, not all courts agree that "should be" statements similar to those at issue here may be characterized as valid standard-of-care opinions.  *Compare Allphin v. Peter K. Fitness, LLC*, 78 F. Supp. 3d 987, 993 (N.D. Cal. 2015) ("[A]n expert does not need to specifically say the words 'medical standard of care' if he clearly, and specifically, describes what care a doctor, operating under similar circumstances as the plaintiff's treating physicians, would have exercised in treating a similarly situated plaintiff.") *with Suarez by Suarez v. Wilmington Med. Ctr., Inc.*, 533 A.2d 1249, 1252 (Del. Super. Ct. 1987) ("But testimony regarding what the standard should be is inapposite to the inquiry of what the standard is.  This Court, therefore, concludes that Dr. Museles fails to qualify as an expert . . . .").

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable factfinder could also conclude that Nurse Markey breached this asserted standard of care

by failing to perform and chart a mental status assessment for Hager.  Nurse Puchkors testified that a mental status assessment evaluates "orientation[,] . . . appearance, attitude, behavior, affect, mood, perception, thought process, insight, judgment."  (Doc. 82-1 at 25.  *See also* Doc. 57-1 at 15 ["mental status exam" of Hager during his June 17, 2013 visit to a VA clinic assessing "appearance/behavior"; "motor/neuro"; "speech"; "mood"; "affect"; "orientation"; "thought process and content"; "judgment/insight"].)  Although Nurse Markey took notes during her examination of Hager documenting some of those required considerations, such as Hager's thought process and content and judgment/insight,[13] and MSA Underwood assessed Hager's thought process during the PTSD, depression, and suicide screenings,[14] those notes, even collectively, omit the majority of the required components of a mental status assessment as defined by Nurse Puchkors.  (*Compare* Doc. 57-1 at 25-30 [Nurse Markey's notes] *and id.* at 31-33 [MSA Underwood's notes] *with id.* at 15-16 [June 17, 2013 mental status assessment].)  Tellingly, Defendant does not appear to argue that Nurse Markey actually performed and charted a mental status assessment.  Instead, Defendant cites various pieces of evidence in an effort to show that *if* Nurse Markey had done so, the results would have been "essentially normal" and thus "[e]ven if Nurse Markey failed to perform or chart a mental status assessment, there is no evidence that Mr. Hager's mental status was altered or that the failure to chart his mental status caused his suicide."  (Doc. 82 at 6-7.)  But those arguments go to the question of causation, which is addressed in Part V, and not to the antecedent question of breach addressed here.

---

[13]     Nurse Markey's notes stated that Hager did not take his medications because of his work, "[a]gree[d] to take his firearms to his fathers [sic] house," denied suicidal ideation or plan, stopped running his veteran Facebook page, and verbalized his understanding of the resources Nurse Markey provided.  (Doc. 57-1 at 26-28.)

[14]     The PC-PTSD-5+I9 included questions about whether Hager "[h]ad nightmares about the event(s) when you did not want to"; "[t]ried hard not to think about the event(s) or went out of your way to avoid situations that remind you of the event(s)"; had "[b]een constantly on guard, watchful, or easily startled"; "felt numb or detached from people, activities, or your surroundings"; and "felt guilty or unable to stop blaming yourself or others for the event(s) or any problems the event(s) may have caused"; and also "how often have you been bothered by thoughts that you would be better off dead or of hurting yourself in some way."  (Doc. 57-1 at 31-32.)  The PHQ-2+I9 asked questions about Hager's "interest and pleasure in doing things" and whether he felt "down, depressed, or hopeless" or "better off dead or . . . hurting [himself] in some way."  (*Id.* at 32.)

D.      **Suicide Risk Assessment (SRA)**

Nurse Puchkors also testified that "there were deficiencies in the . . . suicide risk assessment and formulation" (Doc. 82-1 at 23) and later elaborated, when asked to describe "what . . . a documented suicide risk assessment look[s] like," that "[y]ou would document the risk factors.  You would document warning signs.  You would document protective factors.   You would document what level of risk you felt they were, who you communicated that to, and what interventions you were putting in place to mitigate the risk" (*id.* at 34).  Nurse Puchkors further testified that although Nurse Markey administered the C-SSRS to evaluate Hager's suicide risk, the C-SSRS "is meant to be a screening tool . . . with further assessment to be done by the clinician to determine [suicide] risk.  It's not independent."  (*Id.*)

At this point in the deposition, defense counsel asked Nurse Puchkors to clarify whether she viewed the performance of an SRA during every examination as part of the standard of care or merely as a "best practice."  The following colloquy ensued:

> Q:    And is a suicide risk assessment required at every appointment for every patient?
>
> A:    I don't know what the VA requires, but it would be best practice in this case.
>
> Q:    Well, I'm asking you: Does the standard of care require that a suicide risk assessment be performed for every patient at every appointment?
>
> A:    Yes.
>
> Q:    Where does that standard derive from?
>
> A:    So the American Psychiatric Nurses Association has outlined a set of competencies for psychiatric mental health nurses that includes doing a comprehensive suicide risk assessment as part of their assessment process.  Part of the overall mental health assessment.
>
> Q:    And you said that's the American Psychiatric Nurses Association?
>
> A:    Um hum.  Yes.
>
> Q:    Is that a best practice or is that a requirement?

A:      That is a best practice.

(*Id.* at 35.)  In other words, Nurse Puchkors initially testified that the performance of an SRA during every examination would merely "be best practice in this case," then seemed to backtrack and say that the performance of an SRA during every examination is part of the standard of care, but then backtracked again and confirmed it is "a best practice."

As courts have recognized, testimony about "best practices" is insufficient to establish the applicable standard of care in a negligence action.  *See, e.g.*, *Leibel v. City of Buckeye*, 556 F. Supp. 3d 1042, 1082 (D. Ariz. 2021) ("[W]hen asked to identify the source of the applicable 'standard of care on training,' Barta conceded that 'I can't find a professional standard that I can point directly to.'  Instead, Barta merely stated that providing autism training would be considered a 'best practice[].'  As courts have recognized, such testimony is insufficient to establish the applicable standard of care in a negligence action.") (cleaned up); *Nickolas v. Structured Asset Mortg. Inv. II Tr. 2006-AR8*, 2013 WL 11826532, *2 (D. Ariz. 2013) ("Nickolas does not provide authority stating conduct contrary to 'best practices guidelines' supports a negligence claim."); *Somerville ex rel. Somerville v. United States*, 2010 WL 2643533, *5 n.9 (M.D. Fla. 2010) ("The Court disagrees with Plaintiff's contention that Dr. Coady deviated from the standard of care by not following 'best practices' guidelines.  The standard of care is not equivalent to 'best practices.'"); *Ewans v. Wells Fargo Bank, N.A.*, 389 F. App'x 383, 390 (5th Cir. 2010) ("Negligence law is concerned with reasonable practices, not best practices.").[15]

Alternatively, even assuming the administration of an SRA forms part of the

---

[15]      The Court perceives no tension between this conclusion and the conclusion reached in Part III.C as to Nurse Puchkors's "should be" testimony regarding a mental status assessment.  A reasonable factfinder could construe that testimony as opining about the standard of care because Nurse Puchkors seemed to be answering "yes" (albeit with less than ideal precision) to a question about whether she viewed the asserted requirement as falling within the standard of care.  (Doc. 82-1 at 25-26 [Q: "[D]oes the standard of care require that [N]urse Markey have performed and charted a mental status exam on every patient that she saw?"  A: "It should have been the standard of her assessment, yes."].)  Here, in contrast, Nurse Puchkors repeatedly described the asserted requirement as a "best practice" rather than as part of the standard of care, including when she was specifically asked to differentiate between the two.

standard of care, no reasonable factfinder could conclude on this record that Nurse Markey breached that duty.  Nurse Markey and MSA Underwood assessed Hager not only with the C-SSRS (Doc. 57-1 at 29-30) but also with the PC-PTSD-5+PHQ (*id.* at 31-32), the PHQ-2+I9 (*id.* at 32-33), an alcohol use screen (*id.* at 27), and a tobacco use screen (*id.* at 27-28).  (*See also id.* at 6-7 ¶ 20 ["When I met with Mr. Hager, I administered the [C-SSRS] . . ., and completed a[n] [SRA] . . . ."]; *id.* at 26 ["SRA & PQ 9 Info."].)  As defense expert Nurse Kifle Jikamo opined, and as the undisputed evidence shows: "RN Markey did not rely solely on the C-SSRS when she assessed Mr. Hager's suicide risk.  RN Markey considered the results of the C-SSRS and the [PHQ-2+I9], a separate depression and suicide screening tool, which was also administered to Mr. Hager on June 24, 2019, and yielded a negative screen for depression or suicide.  RN Markey assessed Mr. Hager's presentation, demeanor, medical history, and his responses to her questions.  RN Markey did not rely solely on the C-SSRS to assess Mr. Hager's suicide risk, but instead relied upon his responses to the [C-SSRS], the PHQ2-I9, a PTSD screen, his clinical presentation on June 24, 2019, and his responses to her questions during their counseling session to determine that he was at low risk of suicide."  (Doc. 82-1 at 81.)  Even if, as Plaintiffs' counsel asserted during oral argument and as Nurse Puchkors seemed to opine during her deposition, Nurse Markey's suicide-assessment effort remained "deficien[t]" (*id.* at 23) despite administering all of those tests and considering all of those factors, Nurse Puchkors did not opine that the standard of care required Nurse Markey to do more.  Identifying a deficiency in another medical provider's performance is not the same thing as opining that the deficiency fell below the standard of care.  *See, e.g.*, *Leibel*, 556 F. Supp. 3d at 1082 n.14 ("[S]aying a defendant 'should' have done something is not the same thing as saying the defendant's failure to do so fell below the standard of care."); *Robson v. Tinnin*, 911 S.W.2d 246, 248 (Ark. 1995) ("Quite simply, a statement that a dentist should have given a particular treatment or taken a particular course of action is not the equivalent of stating the applicable standard of care and breach thereof."); *Monroe v. Blevens*, 185 So.3d 419, 422 (Miss. Ct. App. 2016) ("[T]he fact that something 'should have' been done is not

equivalent to stating that it would have been done by a minimally competent physician in the same specialty or general field of practice throughout the United States . . . .") (cleaned up).

### E.   Intervention

Nurse Puchkors also testified that "there were deficiencies in the . . . intervention" (Doc. 82-1 at 23) and later seemed to identify four related "interventions for suicide prevention and discharge" that Nurse Markey should have performed—(1) developing a safety or follow-up plan; (2) communicating with Hager's family to develop the safety plan; (3) removing lethal means from Hager's home; and (4) making a same-day referral for an assessment by another provider (*id.* at 28, 37, 41).  Similarly, in her report, Nurse Puchkors wrote: "Following triage, Mr. Hager should have had a comprehensive safety plan implemented that included the input of family members, if at all possible; and Mr. Hager should have had a comprehensive assessment by a competent provider that same day, if possible."  (Doc. 85-1 at 6.)

As for the first intervention (developing a safety plan), Nurse Puchkors later clarified that it only forms part of the standard of care if the patient's assessed level of suicide risk is not "low":

> Q.   If someone is determined to be at low risk of suicide, is the safety plan required?
>
> . . . .
>
> A.   A safety plan would not be required, but it would still be an evidence-based intervention that would be appropriate.
>
> Q.   So do I understand your testimony to be, then, if a patient is determined to be at low risk of suicide, a safety plan is not required; but there would be no harm in instituting one for that patient?  Is that accurate?
>
> A.   Sure.

(Doc. 82-1 at 28-29.)[16]

---

[16]   Nurse Puchkors's opinion on this issue is consistent with the opinion of the defense

This qualification is notable because Plaintiffs do not dispute that Hager's score on the C-SSRS categorized him as low risk for suicide (Doc. 57-1 at 29-30) and do not dispute that Nurse Markey perceived Hager as posing a low risk for suicide. Thus, on this record, no reasonable factfinder could find that Nurse Markey breached the "developing a safety plan" component of Nurse Puchkors's opined-to standard of care.

This conclusion is not undermined by Nurse Puchkors's assertions in her report that the C-SSRS did not accurately capture Hager's suicide risk and "is not meant to be comprehensive" and that "had Nurse Markey implemented a comprehensive safety plan and assessment, Mr. Hager's risk of suicide would have likely been indicated." (Doc. 85-1 at 6.) As an initial matter, Nurse Puchkors's report contradicts her later testimony. Nurse Puchkors testified that the standard of care only requires a nurse to develop a safety plan *if* the patient is not deemed a low risk of suicide; the safety plan itself is not used to determine a patient's suicide risk. More important, as discussed in Part III.D above, Plaintiffs have not established that Nurse Markey's use of the C-SSRS, PHQ-2+I9, and PC-PTSD-5+I9 to evaluate Hager's risk of suicide breached the standard of care. Even if, as Plaintiffs argue, those tests are inadequate because they only rely on a patient's expressed suicidal ideation,[17] Nurse Puchkors did not opine that using those tests to evaluate suicide risk breaches the standard of care. *Leibel*, 556 F. Supp. 3d at 1082 n.14; *Robson*, 911 S.W.2d

expert, Nurse Jikamo: "A safety plan should be prepared if a patient is at high or intermediate risk of suicide. Because Mr. Hager was not at high or intermediate risk of suicide, the standard of care did not require RN Markey to develop a safety plan with him." (*Id.* at 81.)

[17]     Plaintiffs attempt to make this argument through their citation of medical articles—including a few authored by one of the defense experts, Dr. Alan Berman—that critique the efficacy of the C-SSRS to evaluate suicide risk. (*See, e.g.*, Doc. 85-1 at 18 ["Given the frequency with which SI is denied immediately preceding death by suicide, a singular focus on SI as a marker of increased near-term risk or as a necessary gateway to further suicide risk assessment appears misguided. This finding raises questions about the value of prevalently used screening tools (C-SSRS, PHQ-9, Question 9; and the ASQ) that rely of the admission of SI (and its severity) as a gateway to a formulation of heightened risk for suicide."]; Doc. 85-3 at 201 ["Moreover, we also discussed the difference that makes no difference, that is, that active SI has no greater predictive value with regard to future suicidal behavior compared with passive SI . . . . Findings such as these bring into question the underpinnings of scales such as the [C-SSRS] that establishes a Likert scale for assessing SI with active ideation having greater clinical and predictive import than passive ideation."], internal citations omitted; Doc. 85-4 at 307 ["The evidence suggests that the [C-SSRS] is conceptually and psychometrically flawed . . . ."].)

- 20 -

at 248; *Monroe*, 185 So.3d at 422.[18]

More broadly, it is undisputed that Hager did not report suicidal behavior or intent to Nurse Markey or MSA Underwood during the C-SSRS or otherwise during his evaluation, and as a result, Nurse Markey calculated Hager's suicide risk as low.  (Doc. 57-1 at 26 [progress note quoting Hager: "I am not suicidal or anything"]; *id.* [progress note: "Denies thoughts of suicide"]; *id.* at 29 [C-SSRS, answering "no" to the questions: "Over the past month, have you wished you were dead or wished you could go to sleep and not wake up?"; "[o]ver the past month, have you had any actual thoughts of killing yourself?"; and "[i]n your lifetime, have you ever done anything, started to do anything, or prepared to do anything to end your life . . . ?"]; *id.* at 32 [PC-PTSD-5+PHQ: "Over the last 2 weeks, how often have you been bothered by thoughts that you would be better off dead or of hurting yourself in some way?  Not at all"]; *id.* [PHQ-2+I9: "Thoughts that you would be better off dead or of hurting yourself in some way[.]  Not at all"]; Doc. 82-1 at 40 [Nurse Puchkors: "He did not report that [he had any specific plan or intent to die]"].  *But see* Doc. 57-1 at 32 [PHQ-2+I9: "Feeling down, depressed, or hopeless[.]  Several days"].)  Given this backdrop, no reasonable factfinder could find that Nurse Markey breached Nurse Puchkors's opined-to standard of care by failing to develop a safety plan.  *Cf. Keller v. Arizona Pain Specialists, PLLC*, 2023 WL 5438294, *6 (Ariz. Ct. App. 2023) ("Pannozzo testified the standard of care did not require Brownsberger to stop prescribing opioids based on Kristopher's negative urine drug screens.").

Alternatively, even assuming the formulation of a safety plan is part of the standard of care, the record demonstrates that Nurse Markey did, in fact, discuss the components of a safety plan with Hager—"Hager and I spoke about most of the elements that comprise a safety plan, including identifying warning signs or stressors, discussing coping strategies including utilizing social supports, contact information for additional professional help,

---

[18]    Moreover, Defendant has proffered evidence (which Plaintiffs do not dispute) that the C-SSRS is a ubiquitous tool for assessing suicide risk.  (Doc. 82-1 at 80 [Nurse Jikamo report: "Use of the C-SSRS is nearly universal by mental health care providers"].)

and minimizing access to firearms." (Doc. 57-1 at 9 ¶ 36; *id.* at 25-28.)[19]

Turning to the second intervention identified by Nurse Puchkors (communicating with family members), Nurse Puchkors later clarified during her deposition that such communication is "not required" when preparing a safety plan:

> Q.   And you say that [a safety plan] should have been implemented with the input of his family members. Is it required to obtain the input of family members when preparing a safety plan with the patient?
>
> A.   It's not required.

(Doc. 82-1 at 36.) This testimony forecloses any claim that Nurse Markey breached the standard of care by failing to communicate with Hager's family members. Not only was it unnecessary, under Nurse Puchkors's conception of the standard of care, for Nurse Markey to even formulate a safety plan (because, as discussed, Nurse Puchkors opined that doing so is unnecessary when the assessed suicide risk is low), but Nurse Puchkors acknowledged that family-member communication is "not required" even in the subset of cases requiring a safety plan. That concession means that, under Nurse Puchkors's conception of the standard of care, family-member communication is akin to a best practice, which for the reasons stated earlier is insufficient to support a negligence claim. *See, e.g.*, *Leibel*, 556 F. Supp. 3d at 1082; *Nickolas*, 2013 WL 11826532 at *2; *Somerville*, 2010 WL 2643533 at *5 n.9; *Evans*, 389 F. App'x at 390.

Turning to the third intervention (removal of lethal means), the Court acknowledges that Nurse Puchkors's testimony might, at first blush, appear to establish a standard of care. When asked to identify "what about sending Mr. Hager home with firearms fell below the standard of care," Nurse Puchkors replied that Nurse Markey should have called "a family member or someone who could remove the firearms . . . to confirm that they were removed . . . [o]r had [Hager] contact someone to ensure that the firearms were removed." (Doc.

---

[19]   Nurse Puchkors testified that "[a] safety plan would have included identifying triggers and warnings signs. Identifying coping strategies; people to reach out to; follow up; and crisis numbers; ways to make the environment safe; and reasons for living." (Doc. 82-1 at 36.)

82-1 at 29-30.)  Nevertheless, this testimony is insufficient to demonstrate a breach of the standard of care.  In her report, Nurse Puchkors does not distinguish between implementing a safety plan and removing lethal means.  (Doc. 85-1 at 6 ["Following triage, Mr. Hager should have had a comprehensive safety plan implemented that included the input of family members, if at all possible . . . ."].)  Even during her deposition, Nurse Puchkors blurred the lines between the elements of a safety plan and lethal means intervention—"[a] safety plan would have included . . . ways to make the environment safe."  (Doc. 82-1 at 36.)  As discussed above, Nurse Puchkors effectively conceded that the standard of care did not require Nurse Markey to develop a safety plan or contact Hager's family for their input on a safety plan.  Given the overlap between a safety plan and lethal means intervention, it follows that Nurse Markey did not breach the standard of care by failing to contact Hager's family to remove (or supervise the removal of) his firearms.

Finally, turning to the fourth intervention (same-day counseling), Nurse Puchkors conceded during her deposition that it does not constitute part of the standard of care:

> Q.   Did the standard of care require that Mr. Hager be seen by a competent provider the same day on . . . June 24, 2019?
>
> A.   No.

(*Id.* at 40-41.)

During oral argument, Plaintiffs' counsel argued that Nurse Puchkors's concession on this point is a red herring because she was only discussing whether the standard of care requires being *seen* by another provider on the same day, which is distinct from whether the standard of care required Nurse Markey to make a *referral* to another provider for a same-day appointment.

This argument is unavailing.  Although Nurse Puchkors opined that Nurse Markey "should" have made a same-day referral, she did not opine that the standard of care required a same-day referral.[20]  During her deposition, Nurse Puchkors testified that Nurse Markey

---

[20]      As discussed in earlier portions of this order, there is a decisive difference between those two opinions.  *Leibel*, 556 F. Supp. 3d at 1082 n.14; *Robson*, 911 S.W.2d at 248;

"should have . . . set up a follow-up appointment . . . .  I would have set [a follow-up appointment sooner than 30 days]—yes, she should have.  And/or communicated it to a provider for him to see that day, which is why he was there."  (Doc. 82-1 at 32-33.)  However, Nurse Puchkors was later asked to clarify: "When does the standard of care require that a registered nurse refer a patient to a competent provider for additional assessment?"  (*Id.* at 37.)  In response, Nurse Puchkors testified that the standard of care requires a same-day referral only in certain circumstances: "When there's a change of status.  When there's a concern about safety.  When there's something—some sort of action that needs to happen that's outside of the scope and standards of registered nurse practice; which would be things like prescribing and discharge, and clinical decision making in terms of discharge."  (*Id.*)  Then, during a series of follow-up questions, Nurse Puchkors did not state that Nurse Markey's examination of Hager implicated any of those circumstances.  (*Id.* at 37-39.)  Finally, at the conclusion of that line of questioning, Nurse Puchkors conceded that the standard of care did not require Hager to be seen by another provider on the same day he saw Nurse Markey.  (*Id.* at 40-41.)  Given this backdrop, it is impossible to construe Nurse Puchkors's testimony as providing a valid standard-of-care opinion regarding same-day counseling.[21]  Instead, the only valid opinion on that topic came from the defense expert, Nurse Jikamo, who opined that "neither the standard of care nor Phoenix VA policy required RN Markey to refer [Hager] for an emergency psychiatric evaluation or comprehensive [SRA] on June 24, 2019."  (*Id.* at 81.)[22]

---

*Monroe*, 185 So.3d at 422.

[21]   During oral argument, Plaintiffs' counsel also suggested that there is a conflict between Nurse Puchkors's assertion that Nurse Markey should have made a same-day referral and her statement that the standard of care did not require Hager to be seen by a provider on the same day.  Plaintiffs' counsel further argued that this conflict should not be resolved at summary judgment, but rather should be part of Defendant's cross-examination of Nurse Puchkors at trial.  This argument is unavailing for the reasons explained in the body of this order.

[22]   During oral argument, Plaintiffs' counsel also argued, without citing case law, that if the standard of care requires a same-day referral to a provider, the burden shifts to Defendant to show that Hager could not have been seen by a provider the same day he saw Nurse Markey.  This argument is unavailing because, as explained above, Nurse Puchkors did not testify that the standard of care required a same-day referral.

- 24 -

### F.   Communication

Nurse Puchkors also identified "communication" as an area of deficiency and then elaborated that "[t]he standard of care requires the nurse to communicate any concerns, changes in status, to the interdisciplinary team member."  (Doc. 82-1 at 24.)  However, Nurse Puchkors later clarified that "[i]f she [Nurse Markey] had no concerns [about Hager], there would not be something to report.  If there were no safety concerns, no concerns with discharge risk, then she would not communicate those."  (*Id.* at 24-25.)

This testimony forecloses any claim that Nurse Markey breached the "communication" component of Nurse Puchkors's opined-to standard of care.   It is undisputed that Nurse Markey did not have any concerns that Hager was suicidal.  (Doc. 57-1 at 7 ¶ 27 ["Hager seemed sad during the appointment, but he was forthright and matter of fact when answering my questions."]; *id.* at 7 ¶ 28 ["Hager was not delirious, delusional, psychotic, insane, or otherwise of unsound mind."]; *id.* at 8 ¶ 29 ["There was nothing about Mr. Hager's demeanor or responses to my questions that made me suspect that he was not being truthful in his responses to my questions."]; *id.* at 8 ¶ 30 ["There was nothing about Mr. Hager's demeanor or his responses to my questions that made me believe he was suicidal."]; *id.* at 8 ¶ 31 ["There was nothing about Mr. Hager's mental state that suggested to me that he was at acute or intermediate risk of suicide."]; *id.* at 8-9 ¶ 35 ["[N]othing about Mr. Hager's clinical presentation, his responses to the PHQ-2+I9, the PC-PTSD-5+I9, or the C-SSRS led me to believe that Mr. Hager was not being truthful or was at risk of suicide."].  *See also id.* at 6 ¶ 19 ["MSA Underwood did not advise me that he had any concerns that Mr. Hager was suicidal or posed a danger to others."].)  Thus, under Nurse Puchkors's formulation of the standard of care, Nurse Markey had no duty to communicate those (non-existent) concerns to other providers.

### IV.   Standard Of Care—Nurse Weishaar

In response to the renewed summary judgment motion, Plaintiffs assert that "[t]he VA's own nursing staff also establishes a breach of the standard of care" (Doc. 85 at 3), and then, in a section of the brief entitled "Nurse Weishaar on the Standard of Care," argue

that "[a] defendant's testimony is admissible as to the standard of care" (*id.* at 5). In reply, Defendant argues, among other things, that "Nurse Weishaar cannot opine on Nurse Markey's standard of care because he is not board-certified as a [PMH-BC]." (Doc. 88 at 4.)

Defendant has the better of this argument. As discussed in the earlier summary judgment order, because "Nurse Markey was acting within her specialty as a psychiatric mental health nurse when she treated Hager" and because "Nurse Markey's PMH-BC credential from the ANCC is a 'board certification' for purposes of [A.R.S.] § 12-2604," any witness who wishes to provide expert testimony establishing the standard of care applicable to Nurse Markey must, under Arizona law, possess the same board certification. (Doc. 72 at 6-15.)[23]  It is undisputed that Nurse Weishaar does not have an equivalent certification.  (Doc. 58-3 at 3.)  Thus, Nurse Weishaar is not qualified to opine on the standard of care applicable to Nurse Markey.

This is true even though Nurse Weishaar was Nurse Markey's co-worker. Although "[i]t is accepted in Arizona . . . that the defendant/physician's *own* testimony can establish [the] standard of care," *Potter v. H. Kern Wisner, M.D., P.C.*, 823 P.2d 1339, 1341 (Ariz. Ct. App. 1991) (emphasis added) (citing *Vigil v. Herman*, 424 P.2d 159, 162 (Ariz. 1967), that principle would be implicated only if Plaintiffs were attempting to rely on Nurse Markey's testimony regarding the standard of care, not Nurse Weishaar's. Similarly, although "a policy adopted by a health care provider" may serve as evidence of the standard of care, *Peacock v. Samaritan Health Serv.*, 765 P.2d 525, 529 (Ariz. Ct. App. 1988) (citing *Bell v. Maricopa Med. Ctr.*, 755 P.2d 1180 (Ariz. Ct. App. 1988)), Nurse Weishaar did not testify that Nurse Markey violated any VA policies. Most of Nurse Weishaar's testimony involved describing his own experiences (Doc. 60-1 at 11-14), and although Nurse

---

[23]     During oral argument, Plaintiffs' counsel asserted that A.R.S. § 12-2604 does not apply here because Nurse Markey was working in triage when she treated Hager.  The Court rejected this argument in the earlier summary judgment order.  (Doc. 72 at 7-11 ["Plaintiffs' attempt to distinguish between 'triage' and 'clinical care' is unconvincing— Plaintiffs provide no evidence that triage and clinical care are different 'specialties' within the meaning of § 12-2604, at least with respect to the Willow Clinic."].)

Weishaar then described the VA's policies "on how to perform triage at [the Willow Clinic]," he did not suggest that Nurse Markey violated those policies (*id.* at 14-16).  To the contrary, Nurse Weishaar testified that he did "not see anything" in "the record that would indicate to [him] that Mr. Hager was at elevated risk of suicide that day" and suggested that he would not have felt it necessary to develop a safety plan for Hager or to reach out to Hager's family.  (*Id.* at 15-16.)  Nurse Weishaar also testified that, under VA policy, Nurse Markey was not required to make a referral to a licensed counselor for individual counseling.  (*Id.* at 15 ["No, that's not necessary.  It's just [required upon a finding of positive] suicide risk for the depression scale. . . .  [W]ith the alcohol screen, we give them an opportunity to do alcohol counseling.  In this case, I believe [Hager] was asked and declined alcohol counseling.  He had a positive alcohol screen, I believe, but that doesn't require an LIP [licensed individual practitioner] evaluation."].)  Finally, although Plaintiffs correctly note that Nurse Weishaar stated that "if the patient wants to see a provider, . . . I'll always do the best I can to get them to see somebody" (Doc. 85 at 5, citing Doc. 60-1 at 13), that passage fails to establish a breach of the standard of care for two independent reasons: (1) it does not describe the *VA's* policy, which Nurse Weishaar described as "that is left to our discretion" (Doc. 60-1 at 13), but simply describes Nurse Weishaar's own personal approach; and (2) there is no evidence that Hager insisted on a same-day appointment with another provider or otherwise expressed concern with Nurse Markey's plan to have him meet with a counselor within 30 days.  (Doc. 57-1 at 9 ¶ 40 [Nurse Markey declaration: "I scheduled Mr. Hager for an appointment with Dr. Troutman, a psychiatrist at the Willow Clinic on July 24, 2019.  The appointment date met the Phoenix VA's scheduling policy, which required that an appointment be set within 30 calendar days from the date the Veteran requests outpatient health care service.  Mr. Hager did not express any concern about the appointment date."].)

…

…

…

V.      Proximate Causation

    A.      **The Parties' Arguments**

As discussed in Parts III and IV above, Plaintiffs have only presented legally sufficient evidence of one potential breach of the standard of care by Nurse Markey—her failure to perform and chart a mental status assessment.   Under A.R.S. § 12-563(2), Plaintiffs must show that "[s]uch failure was a proximate cause of the injury."

Defendant argues that Plaintiffs cannot make the required showing because "[e]ven if Nurse Markey failed to perform or chart a mental status assessment, there is no evidence that Mr. Hager's mental status was altered or that the failure to chart his mental status caused his suicide."  (Doc. 82 at 7.)[24]

In response, Plaintiffs do not directly address the interplay between the asserted mental status assessment failure and the issue of proximate causation.  Instead, Plaintiffs more broadly argue that "all that the factfinder needs to find for the Plaintiffs to prevail is that Nurse Markey's negligence was 'a cause' of Ed's death by suicide."  (Doc. 85 at 3, emphasis omitted.)  Plaintiffs argue they can satisfy this burden because "[a]s to causation, the Plaintiffs' expert [Dr. Thomas Joiner] has opined that had [Hager] been seen by a counselor that day, it is more likely than not that he would not have died by suicide."  (*Id.*)

    B.      **Analysis**

"Regarding causation, a plaintiff must show 'a natural and continuous sequence of events stemming from the defendant's act or omission, unbroken by any efficient intervening cause, that produces an injury, in whole or in part, and without which the injury would not have occurred.'  Moreover, a plaintiff must show that causation is probable, not merely speculative."  *Sampson v. Surgery Ctr. of Peoria, LLC*, 491 P.3d 1115, 1118 (Ariz. 2021).  Additionally, "in a medical malpractice case, . . . to establish the requisite causal

---

[24]      Defendant also offers extensive arguments regarding the issues of superseding/intervening and actual cause (*id.* at 10-15), and Plaintiffs offer extensive counterarguments as to those issues (Doc. 85 at 6-13).  Because, as discussed in this order, Defendant is entitled to summary judgment for other reasons, it is unnecessary to reach those issues or proceed with the certification request related to those issues that was contemplated in the earlier summary judgment order (Doc. 72 at 20-28).

connection, the plaintiff's expert is generally required to testify as to probable causes of the plaintiff's injury." *Id.* (cleaned up). "[T]he requirement of expert testimony in a medical malpractice action is a substantive component of the common law governing this tort action, and . . . failure to produce such a witness results in judgment for the defendant." *Id.* at 1118-19 (cleaned up). "[E]xpert causation testimony is necessary unless causation is readily apparent to the jury on the facts. In a case where the standard of care or the cause of death is disputed on a matter requiring medical knowledge to resolve, it is difficult, if not impossible, to imagine a situation where lay jurors, untrained in medicine or medical procedure, could properly determine liability absent expert guidance." *Id.* at 1119 (cleaned up).

Applying these standards, Defendant is entitled to summary judgment. Dr. Joiner, Plaintiffs' expert on causation, did not identify a causal connection between Nurse Markey's failure to perform or chart a mental status assessment and Hager's suicide. In his report, Dr. Joiner opined that Hager had at least a moderate risk of suicide and that had Nurse Markey implemented a proportionate clinical management plan,[25] contacted Hager's family to retrieve or supervise the retrieval of his guns, and scheduled Hager to see a counselor on June 24, 2019, "his safety would have been optimized, his demoralization and depression reduced, and his suicide risk mitigated, all such that it was more likely than not that his death by suicide would have been averted." (Doc. 85-1 at 10-11.) Dr. Joiner specifically focused on the connection between Hager's failure to receive same-day counseling and his suicide—"it is my opinion that if Ed Hager had received counselling on June 24, 2019, it is more likely than not that he would not have attempted suicide." (*Id.* at 9.) But as discussed in Parts III and IV above, Plaintiffs have not come forward with

---

[25]     Dr. Joiner recommended a "clinical management plan that would be proportionate to Mr. Hager's clinical and risk presentation [to] include the following: (a) caring follow-up within hours to days to revisit the issue of safety planning . . . , with a goal both maximizing near-term safety and lessening a crisis' danger via 'remoralization;' (b) ample encouragement to visit with a physician within hours to days to begin a course of antidepressant medication, as determined by the physician; (c) reference, the day of Mr. Hager's initial visit, to principles of behavioral activation that can be instituted immediately . . .; and (d) a longer-term behaviorally-focused psychotherapy, drawing in cognitive therapy principles as appropriate, to be started within days." (Doc. 85-1 at 10.)

cognizable evidence that the standard of care required Nurse Markey to arrange for Hager to receive same-day counseling.[26]

At most, Dr. Joiner's report could be interpreted as opining that Hager's suicide risk level was miscalculated, and had it been properly calculated, Nurse Markey would have implemented a clinical management plan, contacted Hager's family to supervise the removal of his guns, and scheduled him to see a provider that day, which, together, would have more likely than not prevented Hager's suicide. But even this generous reading fails to identify how Nurse Markey's failure to perform or chart a mental status assessment affected Nurse Markey's calculation of Hager's suicide risk or caused his suicide. *Cf. Leimbach v. Hawaii Pac. Health*, 2015 WL 4488384, *10 (D. Haw. 2015) ("Finally, to the extent Plaintiff asserts that Defendants failed to chart his low blood pressure or the assertion of their nurse, the FAC provides no allegations explaining how these omissions are linked to Plaintiff's injury or amount to an EMTALA claim.").

Nurse Puchkors's testimony—although not identified by Plaintiffs as support for their causation argument—does nothing to change the analysis.[27] When asked if she had "an opinion on whether, if all of" the additional steps she identified "had been done, Mr. Hager would have completed suicide," Nurse Puchkors responded: "I don't know that we can answer that. But they are definitely evidence-based interventions that have been shown to decrease the likelihood of suicide." (Doc. 82-1 at 41-42.) Such equivocal expert testimony is insufficient to establish the sort of causal link required by Arizona law. *Sampson*, 491 P.3d at 1119-20 ("More significantly, Dr. Greenberg did not opine that

---

[26] Also, Dr. Joiner did not opine that it was the absence of a *referral* for same-day counseling that caused Hager's suicide—rather, he opined that it was the absence of *actual* same-day counseling that provided a causal link. (Doc. 85-1 at 9, emphasis added ["In sum, it is my opinion that if Ed Hager had *received* counselling on June 24, 2019, it is more likely than not that he would not have attempted suicide . . . ."].) Thus, even if Nurse Puchkors had testified that the standard of care required a same-day referral—which she did not, for the reasons discussed in Part III.E above—her concession that the standard of care did not require actual same-day counseling means there is still a mismatch between the alleged breach of the standard of care and Dr. Joiner's causation theory.

[27] There is also the separate issue that Nurse Puchkors was not retained by Plaintiffs as an expert regarding causation. (Doc. 82-1 at 43 [answering "[n]o" when asked if she was "retained to provide testimony on causation in this matter"].)

insufficient observation was the probable proximate cause of Amaré's death.  Rather, he opined that greater observation 'could have' allowed Surgery Center personnel to resuscitate Amaré. . . .  [T]his failure to connect the dots between the premature discharge and Amaré's death would leave the jury to infer that Surgery Center's failure to observe was the proximate cause.  [But] causation must be shown to be probable and not merely possible, and generally expert medical testimony that a subsequent illness or disease 'could' or 'may' have been the cause of the injury is insufficient.  Dr. Greenberg's assertion that a longer observation period could have prevented Amaré's death is therefore insufficient as a matter of law to prove causation.") (cleaned up); *Spielman v. Indus. Comm'n of Arizona*, 788 P.2d 1244, 1246-47 (Ariz. Ct. App. 1989) (affirming the administrative law judge's determination that an expert's statement, "[h]ow that relates to his industrial injury, I feel is something for you to resolve," was insufficient to establish causation) (emphasis omitted).[28]  Additionally, Nurse Puchkors's equivocal deposition testimony on causation covered the combined impact of *all four* of the deficiencies she cited—even though, as discussed in Part III, Plaintiffs can only show that one of those asserted deficiencies (the failure to perform or chart a mental status assessment) breached the standard of care.

Nor does Nurse Puchkors's report come close to establishing the required causal connection.  In her report, Nurse Puchkors stated that "[h]ad Nurse Markey implemented a comprehensive safety plan and assessment, Mr. Hager's risk of suicide would have likely been indicated. . . . Had Mr. Hager's risk been indicated on that day, then steps could have been taken to prevent Mr. Hager's death by suicide."  (Doc. 85-1 at 6.)  But saying that steps "could" have been taken to prevent Hager's suicide is too vague and equivocal to suffice.  *Sampson*, 491 P.3d at 1120 ("[G]enerally expert medical testimony that a

---

[28]     During oral argument, defense counsel asserted that Dr. Joiner's causation opinions are insufficient for the additional reason that they, too, are filled with the sort of qualifiers and equivocations that *Sampson* forbids.  It is unnecessary to resolve this issue because, as discussed in the body of this order, Dr. Joiner's causation opinions are insufficient for an unrelated reason—the mismatch between those opinions and Nurse Puchkors's opinions regarding the standard of care.

subsequent illness or disease 'could' or 'may' have been the cause of the injury is insufficient.   Dr. Greenberg's assertion that a longer observation period could have prevented Amaré's death is therefore insufficient as a matter of law to prove causation.") (cleaned up).   Additionally, even if Nurse Puchkors's report is generously construed as connecting the failure to perform or chart a mental status assessment to an incorrect suicide risk calculation to Hager's suicide, that connection is speculative and not supported by the record.   As explained in Part III above, Nurse Markey relied on the C-SSRS, PHQ-2+I9, and PC-PTSD-5+I9 to calculate Hager's suicide risk, and these tests use a patient's verbal articulation of suicidal intent, plan, or ideation to calculate suicide risk.   Thus, conducting a mental status assessment would not have changed the results of the C-SSRS, PHQ-2+I9, and PC-PTSD-5+I9, as Hager did not convey suicidal intent, plan, or ideation.   *Cf. Puckett v. United States*, 2023 WL 8436565, *5 (D. Ariz. 2023) ("[E]ven if Dr. Gilbert referred Plaintiff to a cardiologist, there is no indication on what tests or interventions the cardiologist would normally undertake, or what their effect would be.   These unanswered questions leave the jury to speculate, which is impermissible under Arizona law. Moreover, they fail to show a natural and continuous sequence of events stemming from Dr. Gilbert's alleged failure to act and therefore do not show proximate cause.").

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 82) is **granted**.   The Clerk shall enter judgment accordingly and terminate this action.

Dated this 22nd day of February, 2024.

Dominic W. Lanza
United States District Judge